IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF TENNESSEE
NASHVILLE DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| | ) | |
| | ) | No. 3:25-cr-00138 |
| v. | ) | |
| | ) | |
| ALLWASTE ONSITE LLC | ) | |
| d/b/a/ | ) | Judge Trauger |
| ONSITE ENVIRONMENTAL | ) | |

## PLEA AGREEMENT

The United States of America, by the Acting United States Attorney for the Middle District of Tennessee, the Deputy Assistant Attorney General for the Environment and Natural Resources Division, and the Defendant, AllWaste Onsite LLC d/b/a/ Onsite Environmental ("Defendant" or "Onsite Environmental"), by and through its authorized representative, Charles Johnston, and Defendant's attorney, Ty Howard, pursuant to Rule 11(c)(1)(C) of the Federal Rules of Criminal Procedure, have entered an agreement, the terms and conditions of which are as follows:

## Charges in This Case

1. Defendant acknowledges that it has been charged in the Information in this case with knowingly violating the Clean Water Act in violation of Title 33, United States Code, Section 1319(c)(2)(A).

2. Defendant has read the charges against it contained in the Information. Those charges have been fully explained by its attorneys. Defendant fully understands the nature and elements of the crimes with which it has been charged.

<u>Charges to Which Defendant is Pleading Guilty</u>

3. By this Plea Agreement, Defendant agrees to enter a voluntary plea of guilty to Counts One and Two of the Information, charging that Defendant knowingly violated a requirement imposed by the applicable pretreatment program, in violation of the Clean Water Act.

<u>Maximum Penalties</u>

4. The parties understand and agree that the offenses to which Defendant will enter a plea of guilty carry the following maximum penalties: a term of probation of not more than five years; a fine the greater of between $5,000 and $50,000 per day of violation, or twice the gross gain or twice the gross loss resulting from the violation; and a special assessment of $400 (18 U.S.C. § 3013(a)(2)(A)). Defendant further understands that the Court may order restitution to any victims of the offense.

<u>Acknowledgements and Waivers Regarding Plea of Guilty</u>

<u>Nature of Plea Agreement</u>

5. This Plea Agreement is entirely voluntary and represents the entire agreement between the United States Attorney and Defendant regarding Defendant's criminal liability in case 3:25-cr-00138

6. Defendant understands that by pleading guilty it surrenders certain trial rights, including the following:

a. If Defendant persisted in a plea of not guilty to the charges against it, it would have the right to a public and speedy trial. Defendant has a right to a jury trial, and the trial would be by a judge rather than a jury only if Defendant, the United States, and the Court all agreed to have no jury.

2

b. If the trial were a jury trial, the jury would be composed of twelve laypersons selected at random. Defendant and its attorney would have a say in who the jurors would be by removing prospective jurors for cause, or without cause by exercising so-called peremptory challenges. The jury would have to agree unanimously before it could return a verdict of either guilty or not guilty. The jury would be instructed that Defendant is presumed innocent; that the United States bears the burden of proving Defendant guilty of the charge beyond a reasonable doubt; and that it must consider each count of the information against Defendant separately.

c. If the trial were held by the judge without a jury, the judge would find the facts and determine, after hearing all the evidence, whether or not the judge was persuaded of Defendant's guilt beyond a reasonable doubt.

d. At a trial, whether by a jury or a judge, the United States would be required to present its witnesses and other evidence against Defendant. Defendant would be able to confront those government witnesses, and its attorney could cross-examine them. In turn, Defendant could present witnesses and other evidence on its own behalf. If the witnesses for Defendant would not appear voluntarily, it could require their attendance through the subpoena power of the Court.

7. Defendant understands that by pleading guilty it is waiving all the trial rights set forth in the prior paragraph. Defendant's attorney has explained those rights to it, and the consequences of its waiver of those rights.

## Factual Basis

8. Defendant will plead guilty because it is in fact guilty of the charges contained in Counts One and Two of the Information. In pleading guilty, Defendant admits the following facts

3

and that those facts establish its guilt beyond a reasonable doubt:

<u>Regulatory Background and Onsite's Nashville Facility</u>

a. Defendant is a limited liability corporation registered in the State of Tennessee. Defendant's principal business address was 1501 Baptist World Center Drive, Nashville, Tennessee, within the Middle District of Tennessee. In approximately August 2019, American AllWaste LLC formed Onsite Environmental, which then acquired certain assets from Combs Industrial Services. Onsite Environmental thereafter after operated as a wholly owned subsidiary of American AllWaste LLC.

b. Onsite Environmental operates several facilities in Tennessee. The facility located at 1501 Baptist World Drive ("the Nashville facility") was engaged in treating various aqueous non-hazardous liquid waste streams and discharging them to the Nashville sewer system operated by the Metropolitan Government of Nashville and Davidson County ("Metro"). Metro's sewer system was a "Publicly Owned Treatment Works" ("POTW") pursuant to Title 40, Code of Federal Regulations, Section 403.3(q).

c. Metro administers a duly authorized Pretreatment Program under the Clean Water Act, Title 33, United States Code, Section 1317(b). Metro's duly authorized Pretreatment Program is federally enforceable under Title 40, Code of Federal Regulations, Section 403.5(d) and Title 33, United States Code, Section 1317(d). The Metro Department of Water and Sewerage Services is responsible for daily oversight of Metro's Pretreatment Program. Title 33, United States Code, Section 1319(c)(2)(A) makes it a crime to knowingly violate any requirement imposed in a pretreatment program.

d. On or about February 1, 2022, Metro issued to Defendant Industrial Permit CP-0219 ("Permit"), which authorized the company to discharge treated industrial wastewater to

4

its POTW. Metro's duly authorized Pretreatment Program imposed a prohibition on "bypasses," which was defined under Metro's Metropolitan Code of Laws as "the intentional diversion of waste streams from any portion of an industrial user's treatment facility." The prohibition on bypasses was also incorporated into Industrial Permit CP-0219. Under Part II, Section D of that permit, discharge of solid or viscous pollutants in amounts that cause obstruction to the flow of the sewers was also prohibited.

The September 12, 2022, NOV

e.    On September 12, 2022, Metro issued a Notice of Violation ("NOV") to Defendant for discharges of solid or viscous pollutants in amounts that caused obstruction to the flow of the sewers. Specifically, due to sludge buildups downstream from Defendant's Nashville facility, Metro was forced to clean the sewer lines on several occasions, including in February 2021, December 2021, and July 2022.

Metro's Continued Investigation

f.    After Metro issued the NOV, Metro continued to investigate operations at Defendant's Nashville facility.

g.    On December 5, 2022, Metro installed sampling equipment in a manhole downstream of the Nashville facility to collect samples of discharges coming from the facility. Metro collected samples at this downstream location from December 5, 2022, through December 22, 2022. The results revealed that the Nashville facility's discharge of solids and viscous pollutants was at a level that could obstruct the sanitary sewer (including high levels of total suspended solids ("TSS") and Oil and Grease ("O&G")) and violated the permit. These sampling results were documented in the later Show Cause Order and the Agreed Order referenced below.

5

h.     Next, between January 4, 2023, and January 17, 2023, Metro sampled discharges from the downstream manhole location referenced above. Beginning on January 9, 2023, Metro also installed sampling equipment at the discharge flume in the Nashville facility. Comparisons of the sampling results raised concerns that treatment processes at the facility had been bypassed, samples from the discharge flume had been tampered with, or both. The results demonstrated that pollutant concentrations downstream were substantially higher for Biochemical Oxygen Demand ("BOD"), TSS, Ammonia, and O&G than the samples collected at Nashville facility's sampling flume. The coloration of the samples also differed. The samples collected from the Nashville facility's sampling flume were a clear to grayish-colored liquid. By contrast, the samples collected from the downstream location were dark brown with visible light-brown particles and had visible suspended solids.

i.     Metro also inspected the sampling equipment that it had installed at the Nashville facility's discharge flume. The equipment bore signs of tampering. For example, on January 11, 2023, the latches on the sampling equipment that Metro personnel had left unlatched were latched, the sampling equipment had been rotated, and the sampling tube had been moved when Metro returned to the Nashville facility.

The February 23, 2023, Show Cause Order, September 5, 2023, NOV, and Agreed Order

j.     Based on Metro's further investigation, it issued a Show Cause Order to Defendant on February 3, 2023 (Attachment 1) ("Show Cause Order"). In addition, it issued a second Notice of Violation on September 5, 2023, based on discharge violations.

k.     Metro and Defendant resolved the September 12, 2022, NOV, Show Cause Order, and September 5, 2023, NOV in Agreed Order 2023-02, dated November 29, 2023, Attachment 2 ("Agreed Order"). The Agreed Order, among other terms, (i) revoked the prior

6

permit and issued a new permit with enhanced sampling and analysis requirements, (ii) imposed restitution in the amount of $86,627.61 for expenses related to sewer repairs and clean up, (iii) required additional payments of $299,576.40 for surcharges related to pollutant exceedances and of $50,386.75 for water and sewer charges; (iv) various required staffing changes; (v) plant and equipment upgrades; and (vi) operational changes, including a new Facility Operation Plan.

Additional Facts

l.      As to Count One, Defendant admits that, from December 5, 2022, through December 22, 2022, one or more employees who worked at the Nashville facility, acting within the scope of their employment and at least in part for the benefit of Defendant, knowingly bypassed treatment processes and diverted waste streams from portions of the Nashville facility and discharged untreated or partially treated industrial waste into the Metro POTW.

m.      As to Count Two, Defendant admits that, from January 4, 2023, through January 17, 2023, one or more employees who worked at the Nashville facility, acting within the scope of their employment and at least in part for the benefit of Defendant, knowingly bypassed treatment processes and diverted waste streams from portions of the Nashville facility and discharged untreated or partially treated industrial waste into the Metro POTW.

This statement of facts is provided to help the Court determine whether a factual basis exists for Defendant's plea of guilty. The statement of facts does not contain each and every fact known to Defendant or to the United States concerning Defendant's or others' involvement in the offense conduct and other matters.

Sentencing Guidelines Calculations

9.      The parties understand that the Court will consider the United States Sentencing Guidelines (hereinafter "U.S.S.G."), together with the other sentencing factors set forth at 18

7

U.S.C. § 3553(a). The parties agree that the U.S.S.G. to be considered in this case are those effective at the time of sentencing.

10. The United States and Defendant agree that the U.S.S.G. apply in the following manner:

a. U.S.S.G. Chapter 8 ("Sentencing of Organizations") applies in this case.

b. Full restitution has been made. As a result, U.S.S.G. § 8B1.1(a), which relates to entering a restitution order and related procedures, does not apply. *See* U.S.S.G. § 8B1.1(b)(1) (noting that "the provisions of subsection (a) do not apply – (1) when full restitution has been made.").

c. The charge to which Defendant is pleading guilty, 33 U.S.C. § 1319(c)(2), in Counts One and Two is not an offense listed in U.S.S.G. § 8C2.1(a) or (b) ("Applicability of Fine Guidelines"). Under U.S.S.G § 8C2.1, if the offense is not listed in those subsections, the provisions of §§ 8C2.2-8C2.9 do not apply. In that case, U.S.S.G. § 8C2.10 applies.

d. Under U.S.S.G. § 8C2.10, for counts of conviction not covered under § 8C2.1, the Court should determine an appropriate fine by applying the provisions of 18 U.S.C. §§ 3553 and 3572.

e. Under U.S.S.G. § 8D1.2(a), a term of probation "shall be at least one year but not more than five years."

f. Under U.S.S.G. § 8D1.3, the Court may impose conditions for the term of probation, including, but not limited to, conditions that are reasonably related to the nature and circumstances of the offense.

8

<u>Agreement Under Fed. R. Crim. P. 11(c)(1)(C)</u>

11.      This Plea Agreement is governed, in part, by Federal Rule of Criminal Procedure 11(c)(1)(C). That is, the parties have agreed that the sentence imposed by the Court shall include the following specific terms:

a.      A term of probation of 3 years.

b.      The following condition of probation: Defendant shall comply with the Agreed Order, including the applicable Facility Operating Plan referenced therein. If Defendant transfers any operations from the current facility located at 1501 Baptist World Center Drive to another facility that discharges to the Metro POTW, Defendant shall comply with all provisions in Section IV of the Agreed Order and the applicable Facility Operating Plan referenced therein. The required compliance with the Agreed Order includes, but is not limited to, Section IV.1.a. of the Agreed Order, which requires sampling, analysis, and report generation to be performed by third-party contractors.

c.      A fine of $512,000, which constitutes a $16,000 per day fine for each of the 32 days within the date ranges of December 5, 2022, to December 22, 2022, (18 days) and January 4, 2023, to January 17, 2023 (14 days), which shall be due according to the following schedule: $256,000 on the date of sentencing and $256,000 not more than 90 days from the date of sentencing. There shall be no penalty for early payment of the total fine or any portion thereof.

12.      The parties understand and agree that this plea agreement is governed by Fed. R. Crim. P. 11(c)(1)(C) and that, under that Rule, the Court may decline to accept this agreement. If the Court accepts and imposes the agreed term of probation and fine set forth herein, defendant may not withdraw this plea as a matter of right under Federal Rule of Criminal Procedure 11(d). If, however, the Court refuses to impose the agreed term of probation and fine, thereby rejecting

9

the Plea Agreement, or otherwise refuses to accept defendant's plea of guilty, either party shall have the right to withdraw from this Plea Agreement.

<u>Additional Agreements Relating to Sentencing</u>

13.  Regarding restitution, the parties acknowledge and agree that full restitution has been made. Specifically, Defendant has paid restitution to Metro, in the full amounts under the Agreed Order, and no further restitution is due. *See* Agreed Order § IV.2

14.  Defendant agrees to pay the special assessment of $800 at the time of sentencing to the Clerk of the U.S. District Court.

15.  Defendant further agrees and understands that the obligations under this Plea Agreement apply to any successor entities, transferees, or assignees.

16.  Defendant understands that the United States Attorney's Office, in its submission to the Probation Office as part of any Pre-Sentence Report ("PSR") and at sentencing, shall fully apprise the District Court and the United States Probation Office of the nature, scope, and extent of the United States' position on Defendant's conduct regarding the charges against it, as well as any related matters. The United States will also make its position known about all matters in aggravation and mitigation relevant to the issue of sentencing, including the nature and extent of Defendant's cooperation. Defendant understands that it likewise will have a full opportunity to provide information and its position on these issues to the Probation Office and the Court.

17.  This Plea Agreement concerns criminal liability only. Except as expressly set forth in this Plea Agreement, nothing herein shall constitute a limitation, waiver, or release by the United States or any of its agencies of any administrative or judicial civil claim, demand, or cause of action it may have against Defendant or any other person or entity. The obligations of this Plea Agreement are limited to the United States Attorney's Office for the Middle District of Tennessee

10

and cannot bind any other federal, state, or local prosecuting, administrative, or regulatory authorities, except as expressly set forth in this Plea Agreement.

18.     Defendant understands that nothing in this Plea Agreement shall limit the Internal Revenue Service ("IRS") in its collection of any taxes, interest, or penalties from Defendant or its parent corporation or affiliated companies.

## Waiver of Appellate Rights

19.     Regarding the issue of guilt, Defendant hereby waives all (i) rights to appeal any issue bearing on the determination of whether it is guilty of the crime to which it is agreeing to plead guilty; and (ii) trial rights that might have been available if it exercised its right to go to trial. Regarding sentencing, Defendant is aware that 18 U.S.C. § 3742 generally affords a defendant the right to appeal the sentence imposed. Acknowledging this, Defendant knowingly waives the right to appeal a sentence imposed under this Rule 11(c)(1)(C) agreement and the specific terms described in Paragraph 11. No waiver of the right to appeal, or to challenge the adjudication of guilt or the sentence imposed in any collateral attack, shall apply to a claim of involuntariness, prosecutorial misconduct, or ineffective assistance of counsel. Likewise, the United States waives the right to appeal a sentence imposed under this Rule 11(c)(1)(C) agreement and the specific terms described in Paragraph 11.

## Corporate Authorization

20.     Defendant states that it is authorized to enter into this Agreement. At the time of signing by Defendant's representative, Defendant shall provide the United States with a written statement in the form of a corporate resolution certifying that Defendant is authorized to enter and comply with all of the terms of this Agreement. The corporate resolution shall certify that Defendant's governing board has authorized the undersigned representatives to take all actions

11

required and that all corporate formalities for such authorizations have been observed. Defendant agrees that the pleas of guilty will be entered by Defendant by its attorneys and that its attorneys are authorized to enter the plea on its behalf. By entering this guilty plea, Defendant hereby waives all objections to the form of the Information, admits that it is in fact guilty of the offense charged in the Information, and that the facts set forth in the Agreement are a true and accurate statement of Defendant's criminal conduct, and that such statement provides a sufficient basis for Defendant's pleas of guilty to the offense charged in the Information.

Other Terms

21.     Defendant agrees to cooperate with the United States Attorney's Office in collecting any unpaid fine for which Defendant is liable, including providing financial statements and supporting records as requested by the United States. Defendant further agrees that any monetary penalties imposed by the Court will be subject to the terms and payment schedule established in this agreement. Defendant further agrees that, if the terms and payment schedule are not met, the United States may (a) seek immediate enforcement as provided for in 18 U.S.C. § 3613 and (b) submit to the Treasury Offset Programs so that any federal payment or transfer of returned property the defendant receives may be offset and applied to federal debts but will not affect the periodic payment schedule.

22.     Should Defendant engage in additional criminal activity after it has pleaded guilty but before sentencing, Defendant shall be considered to have breached this Plea Agreement, and the United States at its option may void this Plea Agreement.

12

<u>Conclusion</u>

23. Defendant understands that the Information and this Plea Agreement have been or will be filed with the Court, will become matters of public record, and may be disclosed to any person.

24. Defendant understands that its compliance with each part of this Plea Agreement extends until it is sentenced, and failure to abide by any term of the Plea Agreement violates the Plea Agreement. Defendant further understands that in the event it violates this Plea Agreement, the United States, at its option, may move to vacate the Plea Agreement, rendering it null and void, and later prosecute Defendant not subject to any of the limits set forth in this Plea Agreement. Defendant understands and agrees that if the Court permits Defendant to withdraw from this Plea Agreement, or Defendant breaches any of its terms and the United States elects to void the Plea Agreement and prosecute Defendant, any prosecutions that are not time-barred by the applicable statute of limitations on the date of the signing of this Plea Agreement may be commenced against Defendant in accordance with this paragraph, notwithstanding the expiration of the statute of limitations between the signing of this Plea Agreement and the commencement of such prosecutions.

25. Defendant and its attorney acknowledge that no threats have been made to cause Defendant to plead guilty.

26. No promises, agreements, or conditions have been entered into other than those set forth in this Agreement and none will be entered into unless memorialized in writing and signed by all the parties listed below.

27. <u>Defendant's Representative's Signature:</u> I hereby agree that I have consulted Defendant's attorney and fully understand all rights with respect to the pending information.

13

Further, I fully understand all rights with respect to the provisions of the Sentencing Guidelines that may apply in this case. Defendant has read this Plea Agreement and carefully reviewed every part of it with Defendant's attorney. I understand this Plea Agreement, Defendant has voluntarily agreed to it through its duly authorized representatives

Date:____August 5, 2025_____        _____
                                            Defendant Onsite Environmental
                                            Charles Johnston
                                            Authorized Representative of Defendant


28.    Defense Counsel Signature: I am counsel for Defendant in this case. I have fully explained to Defendant its rights with respect to the information. Further, I have reviewed the provisions of the Sentencing Guidelines and Policy Statements, and I have fully explained to Defendant the provisions of those guidelines that may apply in this case. I have reviewed carefully every part of this Plea Agreement with Defendant. To my knowledge, Defendant's decision to enter into this Plea Agreement is an informed and voluntary one.

Date:____August 5, 2025_____        _____
                                            Ty Howard
                                            Bradley Arant Boult Cummings LLP
                                            Attorney for Defendant Onsite Environmental

14

Adam R.F. Gustafson
Acting Assistant Attorney General
Environmental and Natural Resources Division

_Matthew T. Morris_ (signature)

Matthew T. Morris
Senior Trial Attorney
Environmental Crimes Section

Date: 8/5/2025

Robert E. McGuire
Acting United States Attorney
Middle District of Tennessee

_Stephanie N. Toussaint_ (signature)

Stephanie N. Toussaint
Assistant United States Attorney

_Katy Booth_ (signature)

Kathryn Booth
Deputy Criminal Chief

Date: 7/25/25

15

JOHN COOPER



# METROPOLITAN GOVERNMENT OF NASHVILLE AND DAVIDSON COUNTY

METRO WATER SERVICES

IN THE MATTER OF:

**ONSITE ENVIRONMENTAL**                     DEPARTMENT OF WATER
**1501 BAPTIST WORLD CENTER DRIVE**          AND SEWERAGE SERVICES
**NASHVILLE, TN 37207**

## *SHOW CAUSE ORDER*

SCOTT A. POTTER, Director of the Department of Water and Sewerage Services of the Metropolitan Government of Nashville and Davidson County (hereinafter, "Director"), states:

## I. PARTIES

The Metropolitan Government of Nashville and Davidson County (hereinafter, "Metro") is a Governmental, Municipal, and Public Corporation created and existing under and by virtue of the Constitution and laws of the State of Tennessee. Metro is empowered to create, maintain, build, purchase and operate sewers and a sewerage disposal system pursuant to *Section 2.01* of the Charter of Metropolitan Government. The Department of Water and Sewerage Services (hereinafter, "Metro Water Services" or "MWS") is a department of Metro created and existing under and by virtue of *Section 8.501 et.seq* of the Metro. Metro Water Services is empowered by *Section 8.502* of the Metro Charter to construct, operate, and maintain all water and sewerage facilities of Metro.

**Scott A. Potter** is the duly appointed Director of the Department of Water and Sewerage Services.

**ONSITE ENVIRONMENTAL** is located at **1501 BAPTIST WORLD CENTER DRIVE, NASHVILLE, TN 37207**. The Plant Manager of record of **ONSITE ENVIRONMENTAL** is **MR. DAVID STARK**.

Case 3:25-cr-00138    Document 19    Filed 08/05/25    Page 16 of 120 PageID #: 57



**METROPOLITAN GOVERNMENT OF NASHVILLE AND DAVIDSON COUNTY**

METRO WATER SERVICES

## II. JURISDICTION

Pursuant to *Section 309 (a) (3) and (a) (4)*, of the *Federal Water Pollution Control Act, Section 403.8 (f) (1)* of the *Code of Federal Regulations, Section 69-3-101 et. seq.* of the *Tennessee Water Quality Control Act* and *Title 15.60* of the *Metropolitan Code of Laws*; the Department has legal authority to develop, implement and enforce the Federally mandate Pretreatment Program. The Department monitors industrial wastes released by municipal and industrial users to ensure compliance with the pretreatment standards found in the aforementioned statutes. Tenn. Code Ann §69-3-123 (a) (1) provides;

### Pretreatment Enforcement – Procedure – Compliance – Orders

When the local administrative officer of any pretreatment agency has reason to believe that a violation of any provision of the pretreatment program of the pretreatment agency or orders of the local hearing authority issued pursuant thereto has occurred, is occurring, or is about to occur, the local administrative officer may cause a written complaint to be served upon the alleged violator or violators.

### Revocation

Pursuant to Section *Metropolitan Ordinance BL2010-678, (prior code Section 15.60.320)*, **Any permit issued under provisions of this article is subject to be modified, suspended, or revoked in whole or in part, during its term for cause, including but not limited to the following:**

A. *Violation of any terms or conditions of the wastewater discharge permit or other applicable law or regulation;*
B. *Obtaining of a permit by misrepresentation or failure to disclose fully all relevant facts;*
C. *A change in any condition that requires either a temporary or permanent reduction or elimination of the permitted discharge;*
D. *Falsifying self-monitoring reports and certification statements;*
E. *Tampering with monitoring equipment;*
F. *Refusing to allow timely access to the facility premises and records;*
G. *Failure to meet effluent limitations;*
H. *Failure to pay fines;*
I. *Failure to pay sewer charges;*
J. *Failure to meet compliance schedules;*
K. *Failure to complete a wastewater survey or the wastewater discharge permit application;*
M. *Failure to provide advance notice of the transfer of business ownership of a permitted facility.*

Case 3:25-cr-00138    Document 19    Filed 08/05/25    Page 17 of 120 PageID #: 58



# METROPOLITAN GOVERNMENT OF NASHVILLE AND DAVIDSON COUNTY

METRO WATER SERVICES

## III. FACTS

1. **ONSITE ENVIRONMENTAL**, located at **1501 BAPTIST WORLD CENTER DRIVE, NASHVILLE, TN 37207**, discharges industrial wastewater to Metro Water Services.

2. **ONSITE ENVIRONMENTAL**, has been authorized to discharge industrial wastewater to Metro Water Services as per Industrial Permit CP-0219.

3. As per Metro Code of Laws 15.60.080(A)(3), and **ONSITE ENVIRONMENTAL's** Industrial Wastewater Discharge Permit, CP-0219 Part II, Section D, discharge of solid or viscous pollutants in amounts which cause obstruction to the flow of the sewers is prohibited.

4. On September 12, 2022, **ONSITE ENVIRONMENTAL** was issued a Notice of Violation for such a discharge as described above.

5. Metro Water Services and their contracted cleaning services cleaned sewer lines in the vicinity of 1501 Baptist World Center Drive from July 15 to August 13, 2022.

6. Metro Water Services and their contracted cleaning services cleaned sewer lines in the vicinity of 1501 Baptist World Center Drive from December 6 to December 21, 2022.

7. Analytical results (see Attachment A) from samples collected between December 5, 2022, and December 22, 2022, indicate a discharge of solids and viscous pollutants at levels that may obstruct the sanitary sewer. Samples were collected from manhole # 071-09-036 at a location where the only active sewer connections are from 1501 Baptist World Center Drive, indicating that **ONSITE ENVIRONMENTAL** continues to be in violation of Metro Code of Laws 15.60.080(A)(3).

8. A summary of some of the analytical results (Attachment B) identified exceedances of permit limits from samples collected at manhole 071-09-036. This is the first public manhole downstream of **ONSITE ENVIRONMENTAL's** property, and sampling was configured so that only the waste stream from **ONSITE ENVIRONMENTAL** would be collected.

Case 3:25-cr-00138    Document 19    Filed 08/05/25    Page 18 of 120 PageID #: 59



9. From Jan. 9, 2023, to Jan. 17, 2023, the Department's Industrial Pretreatment Program performed a dual site sampling event which included, in a simultaneous fashion, composite samples being taken from Onsite's official sampling point, as well as composite samples being taken from the aforementioned downstream manhole 071-09-036. The samples collected at each site should have been very similar, with slight variation due to the samplers being started a few minutes apart. Based on visual observations and preliminary sampling results, these samples were not similar. In addition, there was visual and physical evidence of tampering for the sampler at the officially designated sample point during the time between Metro Water Services' sample collection visits. (See Attachment C)

Given the stated evidence, it must be concluded that samples collected at the official sampling point were not representative of the entire waste stream from **ONSITE ENVIRONMENTAL** because the sample was tampered with and/or **ONSITE ENVIRONMENTAL** bypassed the official sample point with a portion of their discharge.

Case 3:25-cr-00138    Document 19    Filed 08/05/25    Page 19 of 120 PageID #: 60



JOHN COOPER

## METROPOLITAN GOVERNMENT OF NASHVILLE AND DAVIDSON COUNTY

METRO WATER SERVICES

### IV. ORDER

Whereas, pursuant to the authority vested in me by *Tenn. Code Ann. Section 69-3-123* and *Title 15.60* of the *Metropolitan Code of Laws* and after consideration of the facts alleged within;

I, Scott A. Potter, Director of the Department of Water and Sewerage Services, *pursuant to Metropolitan Code of Laws, Title 15.60.460*, hereby Order **ONSITE ENVIRONMENTAL** and **MR. DAVID STARK** to appear before the Wastewater Hearing Authority to show cause why **ONSITE ENVIRONMENTAL'S** Industrial Discharge Permit CP-0219 should not be suspended or revoked. Additionally, **ONSITE ENVIRONMENTAL** and **MR. DAVID STARK** will be required to show cause why additional civil penalties, costs, and damages should not be assessed for the violations cited.

The hearing will be conducted on **Tuesday, March 7, 2023 at 9:00 AM.** The location of the hearing will be at the Central Biosolids Facility conference room at **1810 Cement Plant Road, Nashville, TN 37208.**

Issued by the Director of the Department of Water and Sewerage Services,

this ____6____ day of ____Feb____, 2023.

Scott A. Potter
Director, Metro Water Services

All correspondence regarding the foregoing Order and Assessment should be sent to:
Tara Ladd, Metropolitan Attorney
1 Public Square, Suite 108, Department of Law
Nashville, TN 37201
(615) 880-3751, E-mail: tara.ladd@nashville.gov

Tara Ladd,  Metropolitan Attorney

{N0517975.1}                        Page 5 of 5

**Attachment A**

**Total Suspended Solids and**

**Oil and Grease**

| Date | TSS | O/G |
|---|---|---|
| 12/5-6/22 | 22,900 | >10,000 |
| 12/6-7/22 | 11,525 | - |
| 12/6-7/22 | 4,640 | 3,370 |
| 12/8-9/22 | 3,075 | 1,529 |
| 12/9-12/22 (Weekend) | 1,045 | 8,001 |
| 12/12-13/22 | 11,695 | 31 |
| 12/13-14/22 | 3,780 | 669 |
| 12/14-15/22 | 15,320 | 13.6 |
| 12/15-16/22 | 13,930 | 159 |
| 12/16-17/22 | 18,120 | - |
| 12/19-20/22 | 2,605 | 7097 |
| 12/20-21/22 | 2,710 | 1698 |
| 12/21-22/22 | 5,850 | 1507 |

All result in mg/L

# Attachment B - Summary of Discharge Violations

**Onsite Violation Summary**
**November/December 2022**

| Number | Parameter | Date | Type | Permit Limit mg/L | Observed Result mg/L | Sampler |
|---|---|---|---|---|---|---|
| 1 | Ammonia | 11/29/2022 | Grab | 600 | 3572 | MWS |
| 2 | Ammonia | 11/29-30/22 | Daily Comp | 300 | 597 | SELF |
| 3 | Ammonia | 12/5-6/22 | Daily Comp | 300 | 788 | MWS |
| 4 | Copper | 12/5-6/22 | Daily Comp | 0.405 | 2.013 | MWS |
| 5 | pH | 12/6/2022 | Grab | 5.0 | 4.77 | MWS |
| 6 | Ammonia | 12/6-7/22 | Daily Comp | 300.0 | 342 | MWS |
| 7 | Copper | 12/6-7/22 | Daily Comp | 0.4 | 1.792 | MWS |
| 8 | Lead | 12/6-7/22 | Daily Comp | 0.2 | 0.244 | MWS |
| 9 | Zinc | 12/6-7/22 | Daily Comp | 5.0 | 13.88 | MWS |
| 10 | Ammonia | 12/7-8/22 | Daily Comp | 300 | 896 | MWS |
| 11 | Copper | 12/7-8/22 | Daily Comp | 0.405 | 3.13 | MWS |
| 12 | Zinc | 12/7-8/22 | Daily Comp | 5.0 | 5.2 | MWS |
| 13 | Ammonia | 12/8-9/22 | Daily Comp | 300 | 479 | MWS |
| 14 | Copper | 12/8-9/22 | Daily Comp | 0.405 | 2.04 | MWS |
| 15 | Copper | 12/9-12/22 | 72hr daily Comp | 0.405 | 0.700 | MWS |
| 16 | Ammonia | 12/12-13/22 | Daily Comp | 300 | 643 | MWS |
| 17 | Copper | 12/12-13/22 | Daily Comp | 0.405 | 1.43 | MWS |
| 18 | Ammonia | 12/13-14/22 | Daily Comp | 300 | 560 | MWS |
| 19 | Copper | 12/13-14/22 | Daily Comp | 0.405 | 0.63 | MWS |
| 20 | Ammonia | 12/14-15/22 | Daily Comp | 300 | 378 | MWS |
| 21 | Copper | 12/14-15/22 | Daily Comp | 0.405 | 6.496 | MWS |
| 22 | Zinc | 12/14-15/22 | Daily Comp | 5.0 | 11.54 | MWS |
| 23 | Ammonia | 12/15-16/22 | Daily Comp | 300 | 501 | MWS |
| 24 | Copper | 12/15-16/22 | Daily Comp | 0.405 | 7.05 | MWS |
| 25 | Lead | 12/15-16/22 | Daily Comp | 0.222 | 0.244 | MWS |
| 26 | Zinc | 12/15-16/22 | Daily Comp | 5.0 | 10.61 | MWS |
| 27 | Copper | 12/16-17/22 | Daily Comp | 0.405 | 1.49 | MWS |
| 28 | pH | 12/19-20/22 | Daily Comp | 10.0 | 10.19 | MWS |
| 29 | Ammonia | 12/20-21/22 | Daily Comp | 300 | 423 | MWS |
| 30 | Copper | 12/20-21/22 | Daily Comp | 0.405 | 0.468 | MWS |
| 31 | Ammonia | 12/21-22/22 | Daily Comp | 300 | 687 | MWS |
| 32 | Copper | 12/21-22/22 | Daily Comp | 0.405 | 0.852 | MWS |
| 33 | Ammonia | 12/30-31/22 | Daily Comp | 300 | 396 | SELF |
| 34 | Copper | December | Monthly Avg | 0.301 | 2.039 | BOTH |
| 35 | Zinc | December | Monthly Avg | 4.46 | 4.727 | BOTH |

All results except pH in mg/L
pH in Standard Units

Attachment C – Description of sampling event as described by Marty Mast, Environmental Compliance Officer III, Metro Water Services

Timeline of events from sampling at Onsite Environmental from January 9, 2023, through January 18, 2023.

On December 5, 2022, an ISCO automatic sampler was set up at manhole # 071-09-036. The sampling tubing was configured such that it only samples the wastewater coming in from the western connection to this manhole. There are no Metro Water Service customers that would discharge from this direction other than Onsite Environmental.

On Monday, January 9, 2023, the sampler at the manhole was serviced and restarted and a 24-hour composite sample was collected between 8:00 AM and 8:30 AM. An ISCO automatic sampler was set up at the discharge flume on the property of Onsite between 8:33 AM and 8:38 AM. While at the flume set up, it was noted that several puddles of reddish liquid were scattered around the ground near the flume.

On Tuesday, January 10, 2023, the sampler at the manhole was serviced and restarted and a 24-hour composite sample was collected between 8:12 AM and 8:24 AM. This sample appeared like the reddish liquid noticed the previous day and had visible solids. This sample is shown in Image 1 as *Onsite below*. The sampler at the flume was serviced and restarted and a 24-hour composite sample was collected between 8:12 AM and 8:24 AM. This sample contained neither the reddish color nor the visible solids and is shown in Image 1 as *Onsite*. There seemed to be something different about the placement of the sampler, but nothing could be confirmed so pictures of the sampler and strainer setup were taken, shown in Image 2 and Image 3.

1

Case 3:25-cr-00138     Document 19     Filed 08/05/25     Page 23 of 120 PageID #: 64

# Image 1



Left bottle:

MH071-09-036

Onsite
*below*

1/9-10/23

TSS = 1280 mg/L
NH3 = 362 mg/L
BOD = 4221 mg/L
Cr = 0.125 mg/L
Co = <0.020 mg/L
Cu = 0.274 mg/L
Pb = 0.024 mg/L
Sn = <0.020 mg/L
Zn = 3.624 mg/L

Right bottle:

**Permit Discharge Flume**

Onsite

1/9-10/23

TSS = 72 mg/L
NH3 = 87.8 mg/L
BOD = 199 mg/L
Cr = 0.031 mg/L
Co = <0.010 mg/L
Cu = 0.019 mg/L
Pb = <0.010 mg/L
Sn = <0.010 mg/L
Zn = 0.404 mg/L

2

# Image 2

Sampler Set-up near Onsite Discharge Flume on 1/10/2023 approx. 08:24am. Note Latch to base is deliberately not connected, tubing wrapped around the base, distance sampler is from the flume. Notice blue "Metro Water" label at 11 O'clock

3

## Image 3

Initial sampler set-up 1/10/2023 approx. 8:24am. Note strainer location is just below the Onsite Discharge Flume.

4

On Wednesday, January 11, 2023, the sampler at the manhole was serviced and restarted, and a 24-hour composite sample collected between 8:02 AM and 8:14 AM. This sample appeared dark brown with visible light brown grease particles and had visible solids. This sample is shown in Image 4 as *Onsite below*. The sampler at the flume was serviced and restarted, and a 24-hour composite sample collected between 8:17 AM and 8:30 AM. This sample appeared like the flume sample from January 10 and contained neither grease nor visible solids and is shown in Image 4 as *Onsite*. In addition, the sampler had been moved further from the flume, rotated, the latches reconnected (they had been intentionally left open the previous day) and the tubing and strainer had been moved as well, as shown in Images 5 and 6. After collecting the samples, the sampler was replaced closer to the flume with the tubing loosely wrapped around the sampler and the strainer placed back in the same position as it has been on Tuesday, as shown in Images 7 and 8. Metro Water Services Laboratory management was notified of the situation and I was told that, if possible, I should bring the situation of the sampler tampering to the attention of Onsite personnel the following day.

# Image 4



# Image 5



1/11/23 approx. 8:15am. Sampler latches are closed, sampler has been rotated, and pulled a further distance away from discharge flume. Notice blue "Metro Water" Label position now at 3 O'clock.

7

# Image 6



1/11/23 approx. 8:15am. Strainer not in original location and moved to inside discharge line.

**Original Location of strainer**

8

# Image 7



Sampler initial set-up 1/11/23 approx. 8:30am. Sampler movement discussed with Onsite management. Notice this time we left a latch closed on backside nearest to the "O" in "ISCO" and sampler pushed very near sample discharge flume.

9

## Image 8



Sampler initial set-up 1/11/23 approx. 8:30am from another angle. Notice tube configuration and closeness of sampler to Flume.

10

On Thursday, January 12, 2023, the sampler at the manhole was serviced and restarted and a 24-hour composite sample collected between 8:19 AM and 8:34 AM. This sample appeared dark brown and had visible solids. This sample is shown in Image 9 as *Onsite below*. The sampler at the flume was serviced and restarted and a 24-hour composite sample collected between 8:37 AM and 8:50 AM. This sample appeared like the flume sample from January 10 and 11 and contained neither grease nor visible solids and is shown in Image 9 as *Onsite*. In addition, the sampler had been moved again further from the flume, rotated, the latches reconnected (they had been intentionally left open the previous day) and the tubing and strainer had been moved as well, as shown in Images 10 and 11. While I was collecting the flume samples, Mr. David Stark, the plant manager for Onsite arrived at the sample point. I pointed out the changes to the sampler and asked if he knew of any reason that the sampler should have been touched. He didn't know of any reason and would be talking to his employees about the situation. After collecting the samples, the sampler was replaced closer to the flume with the tubing more tightly wrapped around the sampler and the strainer placed back in the same position at it has been on Tuesday, as shown in Images 12 and 13. Both Mr. Stark and I took pictures of the set up. I mentioned to Mr. Stark that the latches had been left unconnected by me but had been reconnected by someone else so before leaving I connected just the latch on the north side of the sampler away from where Mr. Stark was sitting in his golf cart.

11

## Image 9



MH071-09-036

*Onsite below*

1/11-12/23

TSS = 10650 mg/L
NH3 = 352 mg/L
BOD = 13273 mg/L
Cr = 0.213 mg/L
Co = 0.053 mg/L
Cu = 2.46 mg/L
Pb = 0.207 mg/L
Sn = 0.348 mg/L
Zn = 7.17 mg/L

Permit Discharge
Flume

*Onsite*

1/11-12/23

TSS = 53 mg/L
NH3 = 90.1 mg/L
BOD = 51 mg/L
Cr = 0.037 mg/L
Co = <0.01 mg/L
Cu = 0.012 mg/L
Pb = <0.01 mg/L
Sn = <0.01 mg/L
Zn = 0.227mg/L

12

# Image 10

1/12/2023 approx. 8:30am. Notice sampler now further from Flume, sampler has been rotated, sample tubing line has been moved to the other side of the sampler



13

# Image 11



1/12/2023 approx. 8:30am. Sampler strainer moved to bottom of catch basin. The original location is just below the flume.

14

# Image 12

1/12/2023 approx. 8:50am. Sampler set-up. Notice sampler placed very near flume, tubing wrapped around sampler base, forward facing latch is undone.

15

# Image 13



1/12/2023 approx. 8:50am. Sampler strainer set-up just below flume.

Case 3:25-cr-00138    Document 19    Filed 08/05/25    Page 38 of 120 PageID #: 79

On Friday, January 13, 2023, the sampler at the manhole was serviced and restarted and a 24-hour composite sample collected between 8:03 AM and 8:18 AM. This sample appeared dark brown and had visible solids. This sample is shown in Image 14 as *Onsite below*. The sampler at the flume was serviced and restarted and a 24-hour composite sample collected between 8:20 AM and 8:29 AM. This sample appeared like the flume sample from January 10, 11 and 12 but did contain some dark black grease but no visible solids and is shown in Image 14 as *Onsite*. This time, the sampler appeared to have been moved only slightly, as shown in Image 15. The only noticeable change was that the only latch connected was the one on the southeast side of the sampler instead of the north side as I had left it. As per Andy Welch's request, sampling was continued for another 24-hour composite at both sample points.

# Image 14



# Image 15



1/13/23 approx.8:20am. Note: front facing latch is now connected, slight position difference of sampler.

19

On Tuesday, January 17, 2023, the sampler at the manhole was serviced and removed and a 24-hour composite sample was collected between 7:42 AM and 8:26 AM. Samples from the composite sampler were collected over the period of 24 hours January 13 to January 14, 2023. This sample appeared dark brown and had extensive visible solids. This sample is shown in Image 16 as *Onsite below*. The sampler at the flume was serviced and shut off and a 24-hour composite sample collected between 8:29 am and 8:36 am. Samples for the composite sampler were collected over the period of 24 hours January 13 to January 14, 2023. This sample appeared like the flume samples from January 10, 11, and 12 and contained neither grease nor visible solids and is shown in image 16 as *Onsite*. The sampler did not appear to have been moved.

Case 3:25-cr-00138    Document 19    Filed 08/05/25    Page 42 of 120 PageID #: 83

# Image 16

Left bottle: MH071-09-036

Onsite
below

1/13-14/23

TSS = 16267 mg/L
NH3 = NA
BOD = NA
Cr = 0.716 mg/L
Co = 0.072 mg/L
Cu = 1.94 mg/L
Pb = 0.09 mg/L
Sn = 0.13 mg/L
Zn = 4.78 mg/L

Right bottle: Permit Discharge Flume

Onsite

1/13-14/23

TSS = 60 mg/L
NH3 = NA
BOD = NA
Cr = 0.032 mg/L
Co = <0.01 mg/L
Cu = 0.015 mg/L
Pb = <0.01 mg/L
Sn = <0.01 mg/L
Zn = 0.16 mg/L

Case 3:25-cr-00138    Document 19    Filed 08/05/25    Page 43 of 120 PageID #: 84

# Image 17



1/18/2023, the sampler at the flume was removed between 11:35 AM and 11:40 AM. Notice: The flow in the flume was exceeding capacity. That was the first time during the sampling event at Onsite that the discharge was witnessed in the flume matched the downstream manhole color and consistency.

22

IN THE MATTER OF:

ONSITE ENVIRONMENTAL
1501 BAPTIST WORLD CENTER DRIVE
NASHVILLE, TN 37207

DEPARTMENT OF WATER
AND SEWERAGE SERVICES

## AGREED ORDER 2023-02

### I. PARTIES

The Metropolitan Government of Nashville and Davidson County (hereinafter, "Metro") is a Governmental, Municipal and Public Corporation created and existing under and by virtue of the Constitution and laws of the State of Tennessee. Metro is empowered to create, maintain, build, purchase and operate sewers and a sewerage disposal system pursuant to *Section 2.01* of the Charter of Metropolitan Government. The Department of Water and Sewerage Services (hereinafter, "Metro Water Services" or "MWS") is a department of Metro created and existing under and by virtue of *Section 8.501 et.seq* of the Metro. Metro Water Services is empowered by *Section 8.502* of the Metro Charter to construct, operate, and maintain all water and sewerage facilities of Metro.

Scott A. Potter is the duly appointed Director of Metro Water Services.

ONSITE ENVIRONMENTAL, INC. ("ONSITE ENVIRONMENTAL") is located at 1501 BAPTIST WORLD CENTER DRIVE, NASHVILLE, TN 37207. The permittee of record is ONSITE ENVIRONMENTAL. The operator of record of ONSITE ENVIRONMENTAL is JIMMY LAND. HARVEY W. COOMBS is the owner of the parcel of land located at 1501 BAPTIST WORLD CENTER DRIVE, where ONSITE ENVIRONMENTAL operates. ONSITE ENVIRONMENTAL, a wholly owned subsidiary of AMERICAN ALLWASTE, INC., has previously done business as COMBS INDUSTRIAL SERVICES, INC. and GREEN TREE PROCESSING, INC.

### II. JURISDICTION

Pursuant to *Section 309 (a) (3) and (a) (4)*, of the *Federal Water Pollution Control Act, Section 403.8 (f) (1)* of the *Code of Federal Regulations, Section 69-3-101 et. seq.* of the *Tennessee Water Quality Control Act* and *Title 15.60* of the *Metropolitan Code of Laws*; the Department has legal authority to develop, implement and enforce the Federally Mandated Pretreatment Program. The Department monitors industrial wastes released by municipal and industrial users to assure compliance with the pretreatment standards found in the aforementioned statutes. Tenn. Code Ann §69-3-123 (a) (1) provides;

{N0536418.1}

When the local administrative officer of any pretreatment agency has reason to believe that a violation of any provision of the pretreatment program of the pretreatment agency or orders of the local hearing authority issue pursuant thereto has occurred, is occurring, or is about to occur, the local administrative officer may cause a written complaint to be served upon the alleged violator or violators.

## III.   ALLEGED FACTS

Metro Water Services alleges the following facts:

1. **ONSITE ENVIRONMENTAL**, located at **1501 BAPTIST WORLD CENTER DRIVE, NASHVILLE, TN 37207**, discharges treated industrial wastewater to Metro Water Services.

2. **ONSITE ENVIRONMENTAL** has been authorized to discharge treated industrial wastewater to Metro Water Services per Industrial Permit CP-0219 ("Permit").

3. Metro Code of Laws Chapter 15.60 and **ONSITE ENVIRONMENTAL'S** Permit govern and establish requirements with respect to **ONSITE ENVIRONMENTAL'S** discharges into the sanitary sewer.

4. **ONSITE ENVIRONMENTAL** was issued a Notice of Violation on September 12, 2022 (Attachment A), Show Cause Order on February 6, 2023 (Attachment B), and a Notice of Violation on September 5, 2023 (Attachment C), all of which include certain alleged facts and alleged violations of law and regulation that are hereby incorporated herein;

5. Metro Code of Laws 15.60.420 authorizes the Director to seek recovery of expenses incurred to clear alleged obstructions, and Metro Code of Laws 15.60.460 authorizes the Director to seek civil penalties for certain alleged violations of law and regulation.

## IV.   AGREED ORDER

ONSITE ENVIRONMENTAL and METRO WATER SERVICES have agreed to the following requirements, whereupon ONSITE ENVIRONMENTAL will promptly notify MWS with the completion of each requirement:

1. METRO WATER SERVICES hereby revokes the Permit and issues a new permit (Attachment D) ("New Permit"). The New Permit contains the following requirements which are not included in the Permit:
   a. Weekly sampling, analysis, and reporting of TSS, BOD, Ammonia, Categorical and Permit-specified Metals, and HEM (Oil & Grease).
   b. Monthly sampling, analysis, and reporting of Categorical Organics.
   c. Sampling, analysis, and report generation events will be conducted by third-party contractors wholly and completely outside of ONSITE ENVIRONMENTAL corporate structure and its ownership's interests, whether financial or familial.

{N0536418.1}                                                   2

d. Sampling events will be randomly chosen on a day of the week while process discharge is occurring and collected by the third-party without prior notification to ONSITE ENVIRONMENTAL personnel.
e. Composite sampling will be conducted by automatic sampler and set to take 100 mL every 15 minutes for 24 hours.
f. Reports will be provided to MWS in the same manner as existing permit CP-0219.
g. Daily discharge reports will be collated and submitted within monthly monitoring reports, listed per batch, to include discharge start and end times, and total batch volume discharged.

2. ONSITE ENVIRONMENTAL will remit financial reimbursement in the amount of $83,627.61 to METRO WATER SERVICES for total expenses resulting from fifteen (15) months of sewer maintenance and repair activities required to remove sewer blockages in the line segment extending from 1501 BAPTIST WORLD CENTER DRIVE, to be paid by ONSITE ENVIRONMENTAL in twenty-four (24) installments of $3484.48 each commencing on the first day of the month following execution of this Agreed Order. Additionally, ONSITE ENVIRONMENTAL has paid, and will continue to pay, surcharges for November 2022 through April 2023, totaling $299,576.40, and other unpaid water and sewer charges totaling $50,386.75 in twelve (12) monthly installments in the amount of $29,363.59. Such installments commenced on August 1, 2023 and will continue monthly through July 1, 2024.

3. METRO WATER SERVICES will make the following adjustments to ONSITE ENVIRONMENTAL'S surcharge billing:

   a. MWS will reset the twelve (12) month rolling average for ONSITE ENVIRONMENTAL'S surcharge calculation. This reset will occur only after ONSITE ENVIRONMENTAL has notified MWS that it has completed all changes included in this Agreed Order that are intended to positively impact their process of treating for compatible pollutants (Biochemical Oxygen Demand, Total Suspended Solids, Oil and Grease, and Ammonia). Reset will begin during the billing period when ONSITE ENVIRONMENTAL first submits sampling results confirming the process improvements.
   b. All surcharge bills thereafter will use data collected at the permitted sampling location and, if sampled, the downstream manhole MH 071-09-036.

4. ONSITE ENVIRONMENTAL has made the following staffing changes:
   a. Replaced the previous plant manager and supervisor with new and trained permanent staff for these positions.
   b. Created and filled a staff position of laboratory technician.

5. ONSITE ENVIRONMENTAL has made or will make the following plant and equipment upgrades:
   a. Reliance on an automatic sampler, to be maintained in good working order at all times, for their own operational monitoring events.
   b. Maintain a flow meter that meets MWS requirements.
   c. Utilization of instrumentation for pH monitoring for batch discharges.

Case 3:25-cr-00138    Document 19    Filed 08/05/25    Page 47 of 120 PageID #: 88

d. Construction of lockable enclosure around effluent flume area to allow access only to those who are collecting samples
e. Installation of video surveillance of effluent flume area
f. Improvement of hydrocarbon process (HEM remediation, see § IV.7.a below)
g. Improvement of leachate aeration (Ammonia remediation, see § IV.7.b below)

6. ONSITE ENVIRONMENTAL has made or will make the following operational changes:
   a. Maintenance and calibration of all instrumentation according to manufacturer's recommendations
   b. Voluntary implementation of and adherence to New Material Approval as set forth in the Facility Operation Plan (Attachment E)
   c. Regular sampling and reporting as mandated by MWS in this Agreed Order.
   d. Batch screening prior to discharge using methods in 40 CFR 136 or as set forth in the Facility Operation Plan.

7. ONSITE ENVIRONMENTAL will implement the Facility Operation Plan, which may be amended or updated from time to time, which includes, without limitation, the following:
   a. Corrective actions to further prevent excessive solids and Hexane Extractable Materials discharge such as:
      i. The volume and discharge rates shall be commensurate with the treatment process to produce the appropriate quality effluent.
      ii. Improvements in plant processes have been identified that will result in increasing the plant handling capacity and separation time.
      iii. The Treatment Process descriptions for Animal and Vegetable Fats, Oils and Grease Treatment and Recovery, Organics (Leachate) Treatment and Recovery, and Oils Treatment and Recovery have been developed to make the process adjustments to improve treatment efficiency.
      iv. The New Material Approval SOP is in place to pre-screen and reject waste streams with high contaminant discharge potential, including precipitates from pH adjustment.
   b. Corrective actions to limit Ammonia and Metals discharge and Metals discharges:
      i. Adjustments have been made to the existing treatment process to limit ammonia discharge to 300 mg/L.
      ii. The New Material Approval (NMA) process is in place to pre-screen and reject waste streams with amounts of ammonia and/or metals greater than the estimated limits of the existing treatment system.
      iii. Plant treatment, design, capacity, and operational changes addressing ammonia and/or metal removal are identified in the Process Descriptions for Organics and Oily Wastes.
      iv. The physical changes in the plant and the operational changes in the processes will make the volume and flow rate commensurate with the ability of the process to address high contaminant discharge potential, including precipitates from pH adjustment to meet the discharge parameters.

## V. RESERVATION OF RIGHTS

1. This Agreed Order resolves all claims of Metro Water for the violations alleged in the Show Cause Order.

{N0536418.1}                                          4

2. This Agreed Order does not limit or affect the rights of the Parties against any third parties, not party to this Agreed Order , nor does it limit the rights of third parties, not party to this Agreed Order , against the City, except as otherwise provided by law.

3. Onsite Environmental agrees to comply with this Agreed Order to avoid the cost of protracted litigation. Onsite Environmental does not admit or deny the factual allegations or the alleged violations of law contained in this Agreed Order, the Notice of Violation, or the Show Cause Order. Onsite Environmental reserves its rights to contest all matters herein, including the factual allegations and alleged violations contained in this Agreed Order, the Notice of Violation, and the Show Cause Order, in any proceeding other than a proceeding brought by the Metro Water to enforce the terms of this Agreed Order.

4. No action taken by ONSITE ENVIRONMENTAL, either previously or in connection with this Agreed Order, shall be deemed or construed to be: (a) an admission of the truth or falsity of any claims heretofore made or (b) an acknowledgment or admission of any fault or liability whatsoever to the Metro Water or to any third party.

AGREED this __29th__ day of November 2023

_____
Scott A. Potter
Director, Department of Water and Sewerage Services

_____
Jimmy Land
For Owner and Operator, ONSITE ENVIRONMENTAL

All correspondence regarding the foregoing Agreed Order should be sent to:
Environmental Compliance, 1360 County Hospital Road, Nashville, TN 37218
Telephone (615) 862-4590, Fax (615) 862-4581.

{N0536418.1}                                             5

Case 3:25-cr-00138   Document 19   Filed 08/05/25   Page 49 of 120 PageID #: 90

# Attachment A

JOHN COOPER
MAYOR

# METROPOLITAN GOVERNMENT OF NASHVILLE AND DAVIDSON COUNTY

DEPARTMENT OF WATER AND SEWERAGE SERVICES
Operations Division - Environmental Compliance
1360 County Hospital Road
Nashville, TN 37218-3019

September 12, 2022

Mr. David Stark
Onsite Environmental
1501 Baptist World Center Drive
Nashville, TN 37207

Dear Mr. Stark:

## RE: NOTICE OF VIOLATION

Inspecton of sewer lines downstream of your facility at 1501 County Hospital Road indicates that this facility is in violation of your permit CP-0219 Part II, Section D (1)(a) and Metro Code of Laws 15.60.080 Section A(3) which prohibit discharge of

*Solid or viscous pollutants in amounts which cause obstruction to the flow of the sewers, or other interference with the operation of or which cause injury to the POTW, including waxy or other materials which tend to coat and clog a sewer line or other appurtenances*

The buildup of sludge downstream of your facility has necessitated cleaing of the sewer line on three occasions in the past year and a half, specifically in February 2021, December 2021 and July 2022.

Additionally, we have reviewed videos of the sewer lines that indicate that the viscous material in question originates from your facility. We are able to share these videos at your request.

This determination is also confirmed with data from sampling of the sludge found in the sewer downstream of your facility with results for n-Hexane Extractable Material (HEM) and Silica Gel Treated n-Hexane Extractable Material (SGT-HEM) (see attachment). The profile of pollutants present is consistent with what we expect to see downstream of your facility.

 
Case 3:25-cr-00138    Document 19    Filed 08/05/25    Page 51 of 120 PageID #: 92

Mr. Stark
page 2

It is imperative that the appropriate following steps be addressed as soon as possible:

1) A written response stating the action you will take to resolve this violation and obtain compliance is required to be received by this office within ten (10) days of the receipt of this Notice of Violation.

2) This violation must be corrected within forty-five (45) days of the receipt of this letter.

3) Compliance within forty-five (45) days may not be feasible. If this is the case, then within this time period, it will be necessary for you to submit, to this office, a schedule of steps you will take to achieve full compliance, including a justification for extending the forty-five (45) day limit. The procedure is explained in Section 15.60.270 of the Metro Code of Laws of the Metropolitan Government of Nashville.

If you have any questions or need additional information, please contact us by calling (615) 862-4590.

Sincerely,

Andrew Welch
Environmental Lab Manager

Enclosures

cc: reading file
    Onsite Environmental File

# Attachment B



JOHN COOPER

# METROPOLITAN GOVERNMENT OF NASHVILLE AND DAVIDSON COUNTY

METRO WATER SERVICES

IN THE MATTER OF:

ONSITE ENVIRONMENTAL
1501 BAPTIST WORLD CENTER DRIVE
NASHVILLE, TN 37207

DEPARTMENT OF WATER
AND SEWERAGE SERVICES

## *SHOW CAUSE ORDER*

SCOTT A. POTTER, Director of the Department of Water and Sewerage Services of the Metropolitan Government of Nashville and Davidson County (hereinafter, "Director"), states:

### I. PARTIES

The Metropolitan Government of Nashville and Davidson County (hereinafter, "Metro") is a Governmental, Municipal, and Public Corporation created and existing under and by virtue of the Constitution and laws of the State of Tennessee. Metro is empowered to create, maintain, build, purchase and operate sewers and a sewerage disposal system pursuant to *Section 2.01* of the Charter of Metropolitan Government. The Department of Water and Sewerage Services (hereinafter, "Metro Water Services" or "MWS") is a department of Metro created and existing under and by virtue of *Section 8.501 et.seq* of the Metro. Metro Water Services is empowered by *Section 8.502* of the Metro Charter to construct, operate, and maintain all water and sewerage facilities of Metro.

Scott A. Potter is the duly appointed Director of the Department of Water and Sewerage Services.

ONSITE ENVIRONMENTAL is located at 1501 BAPTIST WORLD CENTER DRIVE, NASHVILLE, TN 37207. The Plant Manager of record of ONSITE ENVIRONMENTAL is MR. DAVID STARK.

Case 3:25-cr-00138    Document 19    Filed 08/05/25    Page 54 of 120 PageID #: 95

**METROPOLITAN GOVERNMENT OF NASHVILLE AND DAVIDSON COUNTY**

METRO WATER SERVICES

## II. JURISDICTION

Pursuant to *Section 309 (a) (3) and (a) (4)*, of the *Federal Water Pollution Control Act, Section 403.8 (f) (1)* of the *Code of Federal Regulations, Section 69-3-101 et. seq.* of the *Tennessee Water Quality Control Act* and *Title 15.60* of the *Metropolitan Code of Laws*; the Department has legal authority to develop, implement and enforce the Federally mandate Pretreatment Program. The Department monitors industrial wastes released by municipal and industrial users to ensure compliance with the pretreatment standards found in the aforementioned statutes. Tenn. Code Ann §69-3-123 (a) (1) provides;

### Pretreatment Enforcement – Procedure – Compliance – Orders

When the local administrative officer of any pretreatment agency has reason to believe that a violation of any provision of the pretreatment program of the pretreatment agency or orders of the local hearing authority issued pursuant thereto has occurred, is occurring, or is about to occur, the local administrative officer may cause a written complaint to be served upon the alleged violator or violators.

### Revocation

Pursuant to Section *Metropolitan Ordinance BL2010-678, (prior code Section 15.60.320),* **Any permit issued under provisions of this article is subject to be modified, suspended, or revoked in whole or in part, during its term for cause, including but not limited to the following:**

A. *Violation of any terms or conditions of the wastewater discharge permit or other applicable law or regulation;*
B. *Obtaining of a permit by misrepresentation or failure to disclose fully all relevant facts;*
C. *A change in any condition that requires either a temporary or permanent reduction or elimination of the permitted discharge;*
D. *Falsifying self-monitoring reports and certification statements;*
E. *Tampering with monitoring equipment;*
F. *Refusing to allow timely access to the facility premises and records;*
G. *Failure to meet effluent limitations;*
H. *Failure to pay fines;*
I. *Failure to pay sewer charges;*
J. *Failure to meet compliance schedules;*
K. *Failure to complete a wastewater survey or the wastewater discharge permit application;*
M. *Failure to provide advance notice of the transfer of business ownership of a permitted facility.*

**METROPOLITAN GOVERNMENT OF NASHVILLE AND DAVIDSON COUNTY**

METRO WATER SERVICES

## III. FACTS

1. **ONSITE ENVIRONMENTAL**, located at **1501 BAPTIST WORLD CENTER DRIVE, NASHVILLE, TN 37207**, discharges industrial wastewater to Metro Water Services.

2. **ONSITE ENVIRONMENTAL**, has been authorized to discharge industrial wastewater to Metro Water Services as per Industrial Permit CP-0219.

3. As per Metro Code of Laws 15.60.080(A)(3), and **ONSITE ENVIRONMENTAL's** Industrial Wastewater Discharge Permit, CP-0219 Part II, Section D, discharge of solid or viscous pollutants in amounts which cause obstruction to the flow of the sewers is prohibited.

4. On September 12, 2022, **ONSITE ENVIRONMENTAL** was issued a Notice of Violation for such a discharge as described above.

5. Metro Water Services and their contracted cleaning services cleaned sewer lines in the vicinity of 1501 Baptist World Center Drive from July 15 to August 13, 2022.

6. Metro Water Services and their contracted cleaning services cleaned sewer lines in the vicinity of 1501 Baptist World Center Drive from December 6 to December 21, 2022.

7. Analytical results (see Attachment A) from samples collected between December 5, 2022, and December 22, 2022, indicate a discharge of solids and viscous pollutants at levels that may obstruct the sanitary sewer. Samples were collected from manhole # 071-09-036 at a location where the only active sewer connections are from 1501 Baptist World Center Drive, indicating that **ONSITE ENVIRONMENTAL** continues to be in violation of Metro Code of Laws 15.60.080(A)(3).

8. A summary of some of the analytical results (Attachment B) identified exceedances of permit limits from samples collected at manhole 071-09-036. This is the first public manhole downstream of **ONSITE ENVIRONMENTAL's** property, and sampling was configured so that only the waste stream from **ONSITE ENVIRONMENTAL** would be collected.

9. From Jan. 9, 2023, to Jan. 17, 2023, the Department's Industrial Pretreatment Program performed a dual site sampling event which included, in a simultaneous fashion, composite samples being taken from Onsite's official sampling point, as well as composite samples being taken from the aforementioned downstream manhole 071-09-036. The samples collected at each site should have been very similar, with slight variation due to the samplers being started a few minutes apart. Based on visual observations and preliminary sampling results, these samples were not similar. In addition, there was visual and physical evidence of tampering for the sampler at the officially designated sample point during the time between Metro Water Services' sample collection visits. (See Attachment C)

Given the stated evidence, it must be concluded that samples collected at the official sampling point were not representative of the entire waste stream from **ONSITE ENVIRONMENTAL** because the sample was tampered with and/or **ONSITE ENVIRONMENTAL** bypassed the official sample point with a portion of their discharge.

Case 3:25-cr-00138    Document 19    Filed 08/05/25    Page 57 of 120 PageID #: 98



JOHN COOPER

## METROPOLITAN GOVERNMENT OF NASHVILLE AND DAVIDSON COUNTY

METRO WATER SERVICES

## IV. ORDER

Whereas, pursuant to the authority vested in me by *Tenn. Code Ann. Section 69-3-123* and *Title 15.60* of the *Metropolitan Code of Laws* and after consideration of the facts alleged within;

I, Scott A. Potter, Director of the Department of Water and Sewerage Services, *pursuant to Metropolitan Code of Laws, Title 15.60.460,* hereby Order **ONSITE ENVIRONMENTAL** and **MR. DAVID STARK** to appear before the Wastewater Hearing Authority to show cause why **ONSITE ENVIRONMENTAL'S** Industrial Discharge Permit CP-0219 should not be suspended or revoked. Additionally, **ONSITE ENVIRONMENTAL** and **MR. DAVID STARK** will be required to show cause why additional civil penalties, costs, and damages should not be assessed for the violations cited.

The hearing will be conducted on **Tuesday, March 7, 2023 at 9:00 AM.** The location of the hearing will be at the Central Biosolids Facility conference room at **1810 Cement Plant Road, Nashville, TN 37208.**

Issued by the Director of the Department of Water and Sewerage Services,

this _____6_____ day of ___Feb_____ , 2023.

Scott A. Potter
Director, Metro Water Services

All correspondence regarding the foregoing Order and Assessment should be sent to:
Tara Ladd, Metropolitan Attorney
1 Public Square, Suite 108, Department of Law
Nashville, TN 37201
(615) 880-3751, E-mail: tara.ladd@nashville.gov

Tara Ladd, Metropolitan Attorney

{N0517975.1}                                     Page 5 of 5

Case 3:25-cr-00138    Document 19    Filed 08/05/25    Page 58 of 120 PageID #: 99

**Attachment A**
**Total Suspended Solids and**
**Oil and Grease**

| Date | TSS | O/G |
|---|---|---|
| 12/5-6/22 | 22,900 | >10,000 |
| 12/6-7/22 | 11,525 | - |
| 12/6-7/22 | 4,640 | 3,370 |
| 12/8-9/22 | 3,075 | 1,529 |
| 12/9-12/22 (Weekend) | 1,045 | 8,001 |
| 12/12-13/22 | 11,695 | 31 |
| 12/13-14/22 | 3,780 | 669 |
| 12/14-15/22 | 15,320 | 13.6 |
| 12/15-16/22 | 13,930 | 159 |
| 12/16-17/22 | 18,120 | - |
| 12/19-20/22 | 2,605 | 7097 |
| 12/20-21/22 | 2,710 | 1698 |
| 12/21-22/22 | 5,850 | 1507 |

All result in mg/L

## Attachment B - Summary of Discharge Violations

**Onsite Violation Summary**
**November/December 2022**

| Number | Parameter | Date | Type | Permit Limit mg/L | Observed Result mg/L | Sampler |
|---|---|---|---|---|---|---|
| 1 | Ammonia | 11/29/2022 | Grab | 600 | 3572 | MWS |
| 2 | Ammonia | 11/29-30/22 | Daily Comp | 300 | 597 | SELF |
| 3 | Ammonia | 12/5-6/22 | Daily Comp | 300 | 788 | MWS |
| 4 | Copper | 12/5-6/22 | Daily Comp | 0.405 | 2.013 | MWS |
| 5 | pH | 12/6/2022 | Grab | 5.0 | 4.77 | MWS |
| 6 | Ammonia | 12/6-7/22 | Daily Comp | 300.0 | 342 | MWS |
| 7 | Copper | 12/6-7/22 | Daily Comp | 0.4 | 1.792 | MWS |
| 8 | Lead | 12/6-7/22 | Daily Comp | 0.2 | 0.244 | MWS |
| 9 | Zinc | 12/6-7/22 | Daily Comp | 5.0 | 13.88 | MWS |
| 10 | Ammonia | 12/7-8/22 | Daily Comp | 300 | 896 | MWS |
| 11 | Copper | 12/7-8/22 | Daily Comp | 0.405 | 3.13 | MWS |
| 12 | Zinc | 12/7-8/22 | Daily Comp | 5.0 | 5.2 | MWS |
| 13 | Ammonia | 12/8-9/22 | Daily Comp | 300 | 479 | MWS |
| 14 | Copper | 12/8-9/22 | Daily Comp | 0.405 | 2.04 | MWS |
| 15 | Copper | 12/9-12/22 | 72hr daily Comp | 0.405 | 0.700 | MWS |
| 16 | Ammonia | 12/12-13/22 | Daily Comp | 300 | 643 | MWS |
| 17 | Copper | 12/12-13/22 | Daily Comp | 0.405 | 1.43 | MWS |
| 18 | Ammonia | 12/13-14/22 | Daily Comp | 300 | 560 | MWS |
| 19 | Copper | 12/13-14/22 | Daily Comp | 0.405 | 0.63 | MWS |
| 20 | Ammonia | 12/14-15/22 | Daily Comp | 300 | 378 | MWS |
| 21 | Copper | 12/14-15/22 | Daily Comp | 0.405 | 6.496 | MWS |
| 22 | Zinc | 12/14-15/22 | Daily Comp | 5.0 | 11.54 | MWS |
| 23 | Ammonia | 12/15-16/22 | Daily Comp | 300 | 501 | MWS |
| 24 | Copper | 12/15-16/22 | Daily Comp | 0.405 | 7.05 | MWS |
| 25 | Lead | 12/15-16/22 | Daily Comp | 0.222 | 0.244 | MWS |
| 26 | Zinc | 12/15-16/22 | Daily Comp | 5.0 | 10.61 | MWS |
| 27 | Copper | 12/16-17/22 | Daily Comp | 0.405 | 1.49 | MWS |
| 28 | pH | 12/19-20/22 | Daily Comp | 10.0 | 10.19 | MWS |
| 29 | Ammonia | 12/20-21/22 | Daily Comp | 300 | 423 | MWS |
| 30 | Copper | 12/20-21/22 | Daily Comp | 0.405 | 0.468 | MWS |
| 31 | Ammonia | 12/21-22/22 | Daily Comp | 300 | 687 | MWS |
| 32 | Copper | 12/21-22/22 | Daily Comp | 0.405 | 0.852 | MWS |
| 33 | Ammonia | 12/30-31/22 | Daily Comp | 300 | 396 | SELF |
| 34 | Copper | December | Monthly Avg | 0.301 | 2.039 | BOTH |
| 35 | Zinc | December | Monthly Avg | 4.46 | 4.727 | BOTH |

All results except pH in mg/L
pH in Standard Units

# Attachment C

JOHN COOPER
MAYOR

# METROPOLITAN GOVERNMENT OF NASHVILLE AND DAVIDSON COUNTY

DEPARTMENT OF WATER AND SEWERAGE SERVICES
Operations Division Environmental Sciences
1600 Second Avenue North Road
Nashville, TN 37201-2310

September 5, 2023

Mr. Jimmy Land
Onsite Environmental
1501 Baptist World Center Drive
Nashville, Tn 37207

Dear Mr. Land:

## RE: RESULTS OF WASTEWATER SAMPLING - VIOLATION

Enclosed, you will find a copy of the laboratory results from sampling collected in May at the Metro approved sample point and at a downstream manhole via a line that receives wastewater exclusively from Onsite.

On the next page, you will see a summary of discharge violations observed in the results.

No response to this correspondence is required at this time as an Agreed Order is presently being worked on. Be aware that Onsite is still responsible for any violations that may occur at any and all times so Onsite may be subject to additional enforcement action for any such violations..

Case 3:25-cr-00138    Document 19    Filed 08/05/25    Page 62 of 120 PageID #: 103

**Onsite Violation Summary**

**May-23**

| Parameter | Date | Type | Limit mg/L or S.U (pH) | Observed Result mg/L |
|---|---|---|---|---|
| Copper | 5/1-2/23 | Daily | 0.405 | 0.824 |
| Copper | 5/3-4/23 | Daily | 0.405 | 0.431 |
| pH | 5/5/2023 | Daily | 5-10 | 11.72 |
| Copper | 5/5-6/23 | Daily | 0.405 | 0.604 |
| Copper | 5/8-9/23 | Daily | 0.405 | 0.712 |
| Copper | 5/10-11/23 | Daily | 0.405 | 0.422 |
| Copper | 5/17-18/23 | Daily | 0.405 | 0.407 |
| Zinc | 5/17-18/23 | Daily | 5.00 | 29.51 |
| pH | 5/19/2023 | Daily | 5-10 | 4.87 |
| Zinc | 5/18-19/2 | Daily | 5.00 | 7.0 |
| pH | 5/20/2023 | Daily | 5-10 | 4.83 |
| pH | 5/24/2023 | Daily | 5-10 | 4.95 |
| Ammonia | 5/23-24/23 | Daily | 300.0 | 348.7 |
| Copper | 5/23-24/23 | Daily | 0.405 | 0.624 |
| Copper | 5/24-25/23 | Daily | 0.405 | 0.607 |
| Ammonia | 5/25-26/23 | Daily | 300.0 | 403.6 |
| Ammonia | 5/26/2023 | Daily | 300.0 | 315.00 |
| Ammonia | 5/26-27/23 | Grab | 300.0 | 402.5 |
| pH | 5/31/2023 | Daily | 5-10 | 4.74 |
| Copper | 5/31-6/1/23 | Daily | 0.405 | 0.454 |
| Copper | May | Monthly | 0.301 | 0.409 |

If you have any questions or need additional information, please contact us by calling (615) 862-4590.

Sincerely,

Andrew Welch
Environmental Lab Manager

Enclosures
cc: reading file
 Onsite Environmental File



WATER SERVICES



RECEIVED
JUN 2 9 2023
BY: 23-180-01

ROUTING
MDM **XX**

SAMPLE SOURCE: **ONSITE ENVIRONMENTAL**          PERMIT NO.: CP-0219
ADDRESS: 1501 BAPTIST WORLD CENTER DRIVE, NASHVILLE, TN. 37207
LOCATION OF SAMPLE POINT: Samples collected at DOWNSTREAM MANHOLE – SURVEILANCE SAMPLING

All results are in mg/L unless otherwise specified
**COMPOSITE SAMPLE**

| Sample No. | 23 IND 0945 | 23IND0954 | | | Average | Analytical Method |
|---|---|---|---|---|---|---|
| Date | 5/31-6/1/23 | 6/1-2/23 | | | | |
| Time | 9:05-8:50 | 08:50-08:30 | | | | |
| Collected by | AW/AM | WE/NB | | | | |
| Transported by | AW | WE/NB | | | | |
| pH (composite) | 6.84 | 6.87 | | | | 4500H-B |
| BOD | 5846.67 | 8191.67 | | | 6222 | 5210B |
| Suspended Solids | 2610 | 1505 | | | 3290 | 2540D |
| Ammonia | 261.62 | | | | 220 | 350.1 |
| Chromium | 0.125 | 0.161 | | | | EPA 200.8 |
| Cobalt | 0.101 | 0.060 | | | | EPA 200.8 |
| Copper | 0.454 | 0.286 | | | | EPA 200.8 |
| Iron | 91.02 | 180.4 | | | | EPA 200.8 |
| Lead | 0.040 | 0.020 | | | | EPA 200.8 |
| Tin | 0.025 | 0.020 | | | | EPA 200.8 |
| Zinc | 4.161 | 3.999 | | | | EPA 200.8 |
| Received By | AW | S.Miller | | | | |

**GRAB SAMPLE**
Oil & Grease

| Sample No. | | 23IND0955 | | | Average | Analytical Method |
|---|---|---|---|---|---|---|
| Date | | 6/2/23 | | | | |
| Time | | 08:30 | | | | |
| Sample taken by | non rep | WE/NB | | | | |
| pH (grab) / time | | 5.90/08:35 | | | | 4500H-B |
| Oil &Grease (mg/L) | | 1899.15 | | | 5049 | 1664A |
| Received By | S | S.Miller | | | | |

Only methodologies as recommended and approved by the United States Environmental Protection Agency and the most recent *Federal Register* have been used and the results are true and accurate to the best of my knowledge.

Laboratory Officials Signature:          Date:

_____          6/28/23

BD          6/29/23





RECEIVED JUN 16 2023 BY: 23-167-08

ROUTING
MDM **XX**

SAMPLE SOURCE: **ONSITE ENVIRONMENTAL (downstream)**    PERMIT NO.: CP-0219
ADDRESS: 1501 BAPTIST WORLD CENTER DRIVE, NASHVILLE, TN. 37207
LOCATION OF SAMPLE POINT: Samples collected at DOWNSTREAM MANHOLE – SURVEILANCE SAMPLING

All results are in mg/L unless otherwise specified
**COMPOSITE SAMPLE**

| Sample No. | 23IND0907 | 23IND0909 | 23IND0927 | 23IND0928 | Average | Analytical Method |
|---|---|---|---|---|---|---|
| Date | 5/23-24/23 | 5/24-25/23 | 5/25-26/23 | 5/26-27/23 | | |
| Time | 09:30-09:30 | 9:30-9:15 | 09:15-09:15 | 09:20-08:30 | | |
| Collected by | WE/NB | AV/AM | WE/CB | WE | | |
| Transported by | WE/NB | AW | WE/CB | WE | | |
| pH (composite) | 9.33 | 5.67 | 9.23 | 8.30 | | 4500H-B |
| BOD | BD ~~5020~~ 9408.89 | 10008.89 | 6865.83 | 1512.67 | | 5210B |
| Suspended Solids | 5820 | 5120 | 4410 | 468 | | 2540D |
| Ammonia | 348.7 | 96.209 | 403.6 | 402.52 | | 350.1 |
| Chromium | 0.135 | 0.118 | 0.152 | 0.072 | | EPA 200.8 |
| Cobalt | 0.034 | 0.037 | 0.030 | <0.020 | | EPA 200.8 |
| Copper | 0.624 | 0.607 | 0.403 | 0.029 | | EPA 200.8 |
| Iron | 34.85 | 38.62 | 63.96 | 33.87 | | EPA 200.8 |
| Lead | 0.022 | 0.034 | 0.021 | <0.020 | | EPA 200.8 |
| Tin | 0.036 | 0.058 | 0.083 | <0.020 | | EPA 200.8 |
| Zinc | 1.939 | 2.423 | 1.826 | 0.401 | | EPA 200.8 |
| Received By | mmm | AW | RMP | MEM | | |

**GRAB SAMPLE**
Oil & Grease

| Sample No. | 23IND0908 | 23IND0910 | | | Average | Analytical Method |
|---|---|---|---|---|---|---|
| Date | 5/24/23 | 5/25/23 | | | | |
| Time | 09:42 | 9:15 | NO FLOW | NO FLOW | | |
| Sample taken by | WE/NB | AW/AM | | | | |
| pH (grab) / time | 4.95 (09:42) | 5.81/920 | | | | 4500H-B |
| Oil &Grease (mg/L) | 7494.17 | >10,000 | | | | 1664A |
| Received By | mmm | AW | | | | |

Only methodologies as recommended and approved by the United States Environmental Protection Agency and the most recent *Federal Register* have been used and the results are true and accurate to the best of my knowledge.

Laboratory Officials Signature:        Date:

*Diana Sh*                6/15/23

*Chista Moore*                06.15 2023





RECEIVED JUN 16 2023 BY: 23-167-09

ROUTING
MDM __XX__

SAMPLE SOURCE: **ONSITE ENVIRONMENTAL**          PERMIT NO.: CP-0219
ADDRESS: 1501 BAPTIST WORLD CENTER DRIVE, NASHVILLE, TN. 37207
LOCATION OF SAMPLE POINT: Samples collected at DOWNSTREAM MANHOLE – SURVEILANCE SAMPLING

All results are in mg/L unless otherwise specified
## COMPOSITE SAMPLE

| Sample No. | 23IN00868 | 23INPC876 | 23IN00889 | 5/22-23/23 | | Average | Analytical Method |
|---|---|---|---|---|---|---|---|
| Date | 5/17-18/27 | 5/18-19/23 | 5/19-20/23 | 5/22-23/23 | | | |
| Time | 9:00-9:00 | 16:00-9:35 | 9:40-9:40 | | | | |
| Collected by | AW/R | AW/AM | AW/AM | | | | |
| Transported by | CR | AM | AM | | | | |
| pH (composite) | 9.74 | 8.78 | 5.97 | | | | 4500H-B |
| BOD | 7466.67 | 4194.17 | 2320.56 | | | | 5210B |
| Suspended Solids | 4790 | 3660 | 1230 | | | | 2540D |
| Ammonia | 7.853 | xxx | 17.772 | | | | 350.1 |
| Chromium | 0.139 | 0.088 | <0.020 | | | | EPA 200.8 |
| Cobalt | 0.224 | 0.073 | <0.020 | | | | EPA 200.8 |
| Copper | 0.407 | 0.315 | 0.127 | | | | EPA 200.8 |
| Iron | 47.71 | 40.11 | 10.58 | | | | EPA 200.8 |
| Lead | 0.045 | 0.027 | <0.020 | | | | EPA 200.8 |
| Tin | 0.113 | 0.023 | <0.020 | | | | EPA 200.8 |
| Zinc | 29.51 | 7.035 | 0.761 | | | | EPA 200.8 |
| Received By | ETJ | AW | AW | | | | |

## GRAB SAMPLE
Oil & Grease

| Sample No. | 23IN00873 | 23IN00877 | 23IN00840 | 5/23/23 | | Average | Analytical Method |
|---|---|---|---|---|---|---|---|
| Date | 5/18/23 | 5/19/23 | 5/12/23 | 5/23/23 | | | |
| Time | 10:10 | 9:35 | 9:15 | | | | |
| Sample taken by | AW | AW | AW | | | | |
| pH (grab) / time | 7.74/10.15 | 4.57/9:45 | 4.83/9:20 | | | | 4500H-B |
| Oil &Grease (mg/L) | 238.24 | 7821.88 | 2840.20 | | | | 1664A |
| Received By | ETJ | AW | AW | | | | |

Only methodologies as recommended and approved by the United States Environmental Protection Agency and the most recent *Federal Register* have been used and the results are true and accurate to the best of my knowledge.

Laboratory Officials Signature:          Date:

_Diana Sh_          6/15/23

_Christin Mao_          06.15.2023





RECEIVED
JUN 0 7 2023
BY: 23-158-07

ROUTING
MDM XX

SAMPLE SOURCE: **ONSITE ENVIRONMENTAL**          PERMIT NO.: CP-0219
ADDRESS: 1501 BAPTIST WORLD CENTER DRIVE, NASHVILLE, TN. 37207
LOCATION OF SAMPLE POINT: Samples collected at DOWNSTREAM MANHOLE – SURVEILANCE SAMPLING

All results are in mg/L unless otherwise specified
**COMPOSITE SAMPLE**

| Sample No. | 23IND0812 | 23IND0838 | 23IND0840 | 23IND0842 | Average | Analytical Method |
|---|---|---|---|---|---|---|
| Date | 5/8-9/23 | 5/10-11/23 | 5/11-12/23 | 5/12-13/23 | | |
| Time | 09:05- | 9:00-9:00 | 9:25-9:25 | 09:30-09:30 | | |
| Collected by | WE/AW | CJB/AW | AW/AM | WE/CB | | |
| Transported by | WE/AW | CJB/AW | AW | WE/CB | | |
| pH (composite) | 8.78 | 8.56 | 7.52 | 8.70 | | 4500H-B |
| BOD | 72490.00 | 4786.67 | 1145.56 | XXXXXXXX | | 5210B |
| Suspended Solids | 8590 | 4640 | 430 | 2235 | | 2540D |
| Ammonia   5.847 | 11.000 DW | 235.017 | 7.167 | XXXXXXXX | | 350.1 |
| Chromium | 0.125 | 0.130 | <0.020 | 0.126 | | EPA 200.8 |
| Cobalt | 0.140 | 0.175 | <0.020 | 0.059 | | EPA 200.8 |
| Copper | 0.712 | 0.422 | 0.053 | 0.297 | | EPA 200.8 |
| Iron | 76.51 | 201.4 | 3.895 | 39.60 | | EPA 200.8 |
| Lead | 0.085 | 0.054 | <0.020 | <0.020 | | EPA 200.8 |
| Tin | 0.063 | 0.032 | <0.020 | <0.020 | | EPA 200.8 |
| Zinc | 2.518 | 4.461 | 0.269 | 1.589 | | EPA 200.8 |
| Received By | Bm | | | DEF | | |

**GRAB SAMPLE**
Oil & Grease

| Sample No. | 23IND0813 | 23IND0839 | 23IND0841 | 23IND0843 | Average | Analytical Method |
|---|---|---|---|---|---|---|
| Date | 5/9/23 | 5/11/23 | 5/12/23 | 5/15/23 | | |
| Time | 08:25 | 9:20 | 6:50 | 09:00 | | |
| Sample taken by | WE/AW | CJB/AW | AW/AM | WE/CB | | |
| pH (grab) / time | 8.23/08:30 | 7.71/9:20 | 7.26/10:11 | 5.39/09:05 | | 4500H-B |
| Oil &Grease (mg/L) | 330.70 | 27.27 | 56.25 | 8451.79 | | 1664A |
| Received By | Bm | | | DEF | | |

Only methodologies as recommended and approved by the United States Environmental Protection Agency and the most recent *Federal Register* have been used and the results are true and accurate to the best of my knowledge.

Laboratory Officials Signature:          Date:

_Diana Sh_          6/1/23

Discarded by: _Curtis Moore_ 06.06.2023

 

**ROUTING**
MDM **XX**

SAMPLE SOURCE: **ONSITE ENVIRONMENTAL**   PERMIT NO.: CP-0219
ADDRESS: 1501 BAPTIST WORLD CENTER DRIVE, NASHVILLE, TN. 37207
LOCATION OF SAMPLE POINT: Samples collected at DOWNSTREAM MANHOLE – SURVEILANCE SAMPLING

All results are in mg/L unless otherwise specified  AW 791
**COMPOSITE SAMPLE**

| Sample No. | 23IND0770 | 23IND0094 | | 23IND0810 | Average | Analytical Method |
|---|---|---|---|---|---|---|
| Date | 5/1-2/23 | 5/3-4/23 | | 5/5-6/23 | | |
| Time | 11:40 - 09:30 | 9:04 - 9:00 | | 8:03 - 8:05 | | |
| Collected by | AW/WE/AW | AW | MALFUNCTION | AW/AM | | |
| Transported by | AW/WE | AW | | AW | | |
| pH (composite) | 9.24 | 7.24 | | 6.25 | | 4500H-B |
| BOD | 6052.14 | 4923.33 | | XXX | | 5210B |
| Suspended Solids | 2929 | 3115 | SAMPLER | 6460 | | 2540D |
| Ammonia | 51.58 | XXX (NOT LOGGED) | | XXX (NOT LOGGED) | | 350.1 |
| Chromium | 0.031 | 0.037 | | 0.058 | | EPA 200.8 |
| Cobalt | <0.020 | 0.025 | | 0.034 | | EPA 200.8 |
| Copper | 0.824 | 0.431 | | 0.604 | | EPA 200.8 |
| Iron | 12.06 | 12.87 | | 19.09 | | EPA 200.8 |
| Lead | 0.056 | <0.020 | | 0.028 | | EPA 200.8 |
| Tin | <0.020 | 0.080 | | 0.031 | | EPA 200.8 |
| Zinc | 1.773 | 1.720 | | 1.487 | | EPA 200.8 |
| Received By | S. Miller | DEF | | AW | | |

**GRAB SAMPLE**
Oil & Grease  AW792

| Sample No. | | 23IND0972 23IND0793 | 23IND0784 | Average | Analytical Method |
|---|---|---|---|---|---|
| Date | NO FLOW | 5/4/23 8:50 | 5/5/23 | 5/8/23 | | |
| Time | | 9:50 | 08:10 | 9:05 | | |
| Sample taken by | | AW | WE | AW/AM | | |
| pH (grab) / time | | 9.90 | 11.72/08:15 | 5.29/9.10 | | 4500H-B |
| Oil &Grease (mg/L) | | 32.41 ** | 649.09 | 1185.19 | | 1664A |
| Received By | | DEF | TC 3.1.0 | AW | | |

Only methodologies as recommended and approved by the United States Environmental Protection Agency and the most recent *Federal Register* have been used and the results are true and accurate to the best of my knowledge.
**\* SEE INTERNAL NOTES IN LIMS**

Laboratory Officials Signature:       Date:

_Diana Sh_           _DEF_ 5/30/23

_RW_            5/16/23

# Attachment D

October 1, 2023

Mr. Jimmy Land
Onsite Environmental
1501 Baptist World Center Drive
Nashville, TN 37207

**RE: *Industrial User Discharge Permit CP-0219***

Dear Mr. Land:

In accordance with Ordinance Number BL-2010-678, and the enclosed *FINAL Industrial User Discharge Permit, CP-0219* hereby, issued by the Department of Water and Sewerage Services. The continuance and/or reissuance of this permit are contingent upon your meeting the conditions and requirements as stated therein.

Please be advised that you have the right to appeal any of the provisions established in this permit, in accordance with Ordinance Number BL-2010-678.

If you elect to appeal, you should file a petition within forty-five (45) days of this permit. Such petition must be prepared on 8.5 by 11-inch paper addressed to:

Metro Water Services
Environmental Compliance Section
1360 County Hospital Road
Nashville, TN 37218-2503

In such petition, you must state your contention in numbered paragraphs, describing how the action of the Department of Water and Sewerage Services is inappropriate. In absence of such petition, the conditions and requirements of the permit will be enforced in accordance with Ordinance Number BL-2010-678.

If you have any questions concerning this correspondence, please do not hesitate to contact Mr. Andy Welch, by calling (615) 862-4590.

Sincerely,

David M. Tucker
Water Services Deputy Director

DMT: JAW/mdm
cc: Mr. Scott A. Potter, Director of Metro Water Services

INDUSTRIAL USER'S PERMIT NO. CP-0219

AUTHORIZATION TO DISCHARGE UNDER

ORDINANCE NUMBER BL-2010-678

In compliance with the provision of the Federal Water Pollution Control Act, as amended, (33 U.S.C. 1251 et. seq; the "Act"), and with the provisions of Ordinance Number BL-2010-678:

**ONSITE ENVIRONMENTAL** is authorized to discharge **INDUSTRIAL / COMMERCIAL WASTEWATER**, from non-hazardous waste pretreatment and recycling (SIC 4952), with an average discharge of 120,000 gallons per day to **CENTRAL WASTEWATER TREATMENT PLANT**, from the facility located at **1501 BAPTIST WORLD CENTER DRIVE, NASHVILLE, TN 37207**, in accordance with effluent limitations, monitoring requirements and other conditions set forth in Parts I, II, III, and IV. **ONSITE ENVIRONMENTAL** must comply with 40 CFR 437, Centralized Waste Treatment, Subcategory D (oils & organics) (new source).

This permit shall become effective on **OCTOBER 1, 2023,** and shall expire on **OCTOBER 1, 2026**.

Scott A. Potter, Director
Department of Water/Sewerage Services

CENTRALIZED WASTE TREATMENT
40 CFR 437 – NEW SOURCE

SUBCATEGORY D
PERMIT NO: **CP-0219**

## A. WASTEWATER POLLUTANTS – MAXIMUM CONCENTRATIONS

No person or user shall discharge wastewater in excess of the concentration set forth in TABLE A below unless: (1) an exception has been granted to the user under the provisions of Ordinance Number BL-2010-678 or (2) the wastewater discharge permit of the user provides, as a special permit condition, higher interim concentration level in conjunction with the requirement that the user construct a pretreatment facility or institute changes in the operation and maintenance procedures to reduce the concentration of pollutants to levels not exceeding the standards set forth in the table within a fixed period of time.

### (1.) TABLE A

*All pollutant concentration limits are expressed as milligrams per liter (mg/L), except for pH*

| Pollutant | 24 Hour Flow Proportional* Concentration Limit (mg/L) {Daily Maximum} | Comments (see page 3) | Grab Sample Limits (mg/L) |
|---|---|---|---|
| Biochemical Oxygen Demand | Not Applicable | *1 | Not Applicable |
| Suspended Solids | Not Applicable | *1 | Not Applicable |
| Oil & Grease | Not Applicable | *1 | Not Applicable |
| Ammonia | 300 | *2 | 600.0 |
| Arsenic | 1.0 | *5 | 2.0 |
| Cadmium | 0.253 | *5 | 0.506 |
| Chromium-Total (Cr) | 0.746 (*6) | 0.323 (*7) | 7.0 |
| Chromium, VI | 2.2 | *5 | |
| Cobalt | 56.4 (*6) | 18.8 (*7) | |
| Copper | 0.500 (*6) | 0.242 (*7) | 10.0 |
| Lead | 0.350 (*6) | 0.160 (*7) | 3.0 |
| Mercury | 0.0055 | *5 | 0.011 |
| Molybdenum | 1.4 | *5 | 2.8 |
| Nickel | 5.0 | *5 | 10.0 |
| Selenium | 1.0 | *5 | 2.0 |
| Silver | 0.065 | *5 | 0.13 |
| Tin | 0.335 (*6) | 0.165 (*7) | |
| Zinc | 5.0 | 4.50 (*7) | 10.0 |

| Parameter | | | Grab Sample Limits (mg/L) |
|---|---|---|---|
| pH | Not Applicable | *4 | 5.0-10.0 |
| Cyanide | Not Applicable | *5 | 2.0 |
| Toluene | Not Applicable | *5 | 0.82 |
| Benzene | Not Applicable | *5 | 0.27 |
| Bis(2-ethylhexyl) phthalate | Not Applicable | 0.101 (*7) | 0.215 (*6) |
| 1,1,1 Trichloroethane | Not Applicable | *5 | 3.81 |
| Ethylbenzene | Not Applicable | *5 | 0.53 |
| Carbon Tetrachloride | Not Applicable | *5 | 0.35 |
| Carbazole | Not Applicable | 0.276 (*7) | 0.598 (*6) |
| Chloroform | Not Applicable | *5 | 4.76 |
| o-Cresol | Not Applicable | 0.561 (*7) | 1.92 (*6) |
| p-Cresol | Not Applicable | 0.205 (*7) | 0.698 (*6) |
| n-Decane | Not Applicable | 0.437 (*7) | 0.948 (*6) |
| Fluroanthene | Not Applicable | 0.0268 (*7) | 0.0537 (*6) |
| n-Octadecane | Not Applicable | 0.302 (*7) | 0.589 (*6) |
| Tetrachloroethylene | Not Applicable | *5 | 2.30 |
| 2,4,6-Trichlorophenol | Not Applicable | 0,106 (*7) | 0.155 (*6) |
| Trichloroethylene | Not Applicable | *5 | 1.72 |
| 1,2 trans dichloroethylene | Not Applicable | *5 | 0.069 |
| Methylene Chloride | Not Applicable | *5 | 2.02 |
| Total Phenol | Not Applicable | *5 | 3.05 |
| Naphthalene | Not Applicable | *5 | 0.069 |
| Total Phthalates | Not Applicable | *3,5 | 5.41 |
| Xylene | Not Applicable | *5 | 0.27 |
| Hydrogen Sulfide | Not Applicable | *5 | 0.50 |

(2)

Comments:
*Metro Water Services may allow a 24-hour timed composite to be collected
*1: The surcharge threshold for Biochemical Oxygen Demand is 300 mg/L and 325 mg/L for Suspended Solids for a composite sample. The surcharge threshold is 100 mg/L for Oil & Grease grab sample. A maximum limit for these compatible pollutants may be established by Metro.
*2: The surcharge threshold for Ammonia is 30 mg/L, with a maximum limit of 300 mg/L.
*3: Total Phthalates is the sum of bis (2-ethylhexyl) phthalate, benzyl butyl phthalate, di-n-butyl phthalate, and diethyl phthalate.
*4: pH is expressed in Standard Units (S.U.). Any time the pH is outside the 5.0 to 10.0 range it is considered a violation unless a specific variance is granted by Metro Water Services. Samples must be a grab sample that is tested within fifteen (15) minutes of collection.
*5: Local Limit.
*6: Categorical limit
*7: Categorical Limit – monthly average maximum limit

**ONSITE ENVIRONMENTAL** will be allowed to discharge excessive strength **COMPATIBLE** waste and, in lieu of pretreatment, pay a surcharge on the excess. This will be allowed if sufficient capacity remains to treat said waste at the receiving P.O.T.W. **ONSITE ENVIRONMENTAL** must notify the P.O.T.W., in writing, before using this option. Failure to report as required by this permit shall be deemed a violation and enforcement action shall be taken.

(a.) Any discharge of the following compounds or materials is prohibited *(\*1)*:

(I.) Polychlorinated Biphenyls (PCBs)

(II.) Herbicides and Pesticides, including, but not limited to:

| | |
|---|---|
| Aldrin | Heptachlor epoxide |
| Alpha BHC, Beta BHC, Delta BHC, or Gamma BHC * | Hexachlorocyclo-hexane |
| Chlordane | Hexachlorocyclopentadiene |
| Demeton | Lindane |
| Dieldrin | Methoxychlor |
| Endosulfan I | Mirex |
| Endosulfan II | Tetrachlorodiphenylethane (TDE) |
| Endosulfan sulfate | Toxaphene |
| Endrin | Parathion |
| Endrin aldehyde | 4,4-DDD |
| Guthion | 4,4-DDE |
| Heptachlor | 4,4-DDT |

* BHC: Benzene Hexachloride

(III.) Organic compounds that include:

| | |
|---|---|
| Acetone | Phenanthrene |
| Dioxin (TCDD) | 2-butanone (MEK) |
| Hexane | 4-methyl-2-pentanone (MIBK) |

(b.) No Person shall discharge any organic pollutants that result in the presence of toxic gases, vapors, or fumes within a public, or private sewer, or treatment works in a quantity that will cause acute or chronic worker health and safety problems, or danger to the life and health of the public; or will cause any impact to the Metro sewer collection system or any Metro Wastewater Treatment Plant. Organic pollutants subject to this restriction include but are not limited to any organic compound listed in 40 Code of Federal Regulations 433.11(e) – Total Toxic Organics (TTO) list.

*(\*1) "Prohibited" means that these compounds shall not be discharged to the POTW. Any wastewater sample that detects these compounds will be considered a violation of the Metro Water Services' Local Limits.*

(3)

### (2.) Plant Protection Criteria Limits

The table below is the influent protection criteria limits established by the Department. These are technically based calculated limits for the protection of the wastewater treatment plants. These limits were calculated using treatment process upset/inhibition, worker safety, bio-solids quality, and prevention of effluent pass through of pollutants at the POTW. If the influent at the treatment works reaches or exceeds the levels established by said table, the permittee may be required to monitor for these, or any additional parameters not listed below. The Director may also change any of these criteria in the event the POTW effluent standards are changed or in the event changes are deemed advisable for effective operation of the POTW.

### (3.) TABLE B

**Metro Water Services Wastewater Treatment Plant Protection Criteria**
*Influent Limits for each WWTP are expressed in mg/L.*

| Pollutant | Central WWTP 24 Hour Flow Proportional Composite Sample Limit (mg/L) * | Whites Creek WWTP 24 Hour Flow Proportional Composite Sample Limit (mg/L) * | Dry Creek WWTP 24 Hour Flow Proportional Composite Sample Limit (mg/L) * |
|---|---|---|---|
| Ammonia | 33.3 | 33.0 | 33.0 |
| Arsenic (As) | 0.10 | 0.054 | 0.10 |
| Cadmium (Cd) | 0.012 | 0.011 | 0.015 |
| Chromium, Total (Cr) | 0.172 | 0.167 | 0.191 |
| Chromium, VI | 0.059 | 0.059 | NA |
| Copper (Cu) | 0.32 | 0.325 | 0.45 |
| Lead (Pb) | 0.11 | 0.12 | 0.12 |
| Mercury (Hg) | 0.0010 | 0.0010 | 0.0005 |
| Molybdenum (Mo) | 0.256 | 0.055 | 0.176 |
| Nickel (Ni) | 0.31 | 0.183 | 0.31 |
| Selenium (Se) | 0.538 | 0.422 | 0.435 |
| Silver (Ag) | 0.015 | 0.008 | 0.008 |
| Zinc (Zn) | 0.500 | 0.480 | 0.500 |

(4)

TABLE B – cont.

| Pollutant | Grab Sample-Instantaneous Maximum Concentration Limit (mg/L) | Grab Sample-Instantaneous Maximum Concentration Limit (mg/L) | Grab Sample-Instantaneous Maximum Concentration Limit (mg/L) |
|---|---|---|---|
| Naphthalene | 0.005 | 0.005 | 0.005 |
| Total phthalates *1 | 0.230 | 0.219 | 0.230 |
| Cyanide | 0.064 | 0.060 | 0.324 |
| Toluene | 0.036 | 0.063 | 0.081 |
| Benzene | 0.015 | 0.015 | 0.015 |
| 1,1,1 Trichoroethane | 0.200 | 0.200 | 0.200 |
| Ethylbenzene | 0.029 | 0.029 | 0.029 |
| Carbon Tetrachloride | 0.021 | 0.039 | 0.019 |
| Chloroform | 0.258 | 0.258 | 0.258 |
| Tetrachloroethylene | 0.125 | 0.125 | 0.125 |
| Trichloroethylene | 0.091 | 0.091 | 0.091 |
| 1,2 trans dichloroethylene | 0.005 | 0.005 | 0.005 |
| Methylene chloride | 0.132 | 0.132 | 0.132 |
| Total Phenol | 0.258 | 0.190 | 0.163 |
| Xylene | 0.015 | 0.015 | 0.015 |
| Hydrogen sulfide | 0.5 | 0.5 | 0.5 |

*1: Total Phthalates is the sum of bis(2-ethylhexyl) phthalate, benzyl butyl phthalate, di-n-butyl phthalate, & diethyl phthalate.

## (4.) PREVENTION OF ACCIDENTAL DISCHARGES AND SLUG DISCHARGES

For the purposes of this subsection, a slug discharge is any discharge of a non-routine, episodic nature, including but not limited to an accidental spill or a non-customary batch discharge. All Industrial Users shall provide such facilities and institute such procedures as are reasonably necessary to prevent or minimize the potential for accidental discharge into the POTW of waste regulated by this permit from liquid or raw material storage areas, from truck and rail car loading and unloading areas, from in-plant transfer or processing and materials handling areas, from diked areas or holding ponds. The permittee shall notify the POTW immediately by telephone of any slug loadings, spills, bypasses, upsets, etc., and a follow up written notification within five days, as prescribed in 40 CFR 403.8(f)(2)(v). The telephone numbers for reporting accidental discharges are: 7:00 AM - 3:30 PM 862-4590, after hours/weekends/holidays 862-4800.

**ONSITE ENVIRONMENTAL** is currently required to have a slug control plan. The plan shall contain, at a minimum, the following elements:

(a.) Description of discharge practices, including non-routine batch discharges,
(b.) Description of stored chemicals,
(c.) Procedures for immediately notifying the POTW of slug discharges, including any discharge that would violate a prohibition under 40 CFR 403.5 (b), with procedures for follow-up written notification within five days,
(d.) If necessary, procedures to prevent adverse impact from accidental spills, including inspection and maintenance of storage areas, handling and transfer of materials, loading and unloading operations, control of plant site run-off, worker training, building of containment structures or equipment, measures for containing toxic organic pollutants (including solvents), and/or measures and equipment for emergency response.

(5)

Case 3:25-cr-00138    Document 19    Filed 08/05/25    Page 75 of 120 PageID #: 116

### (5.) PROHIBITION OF BYPASS

Bypass means the intentional diversion of waste streams from any portion of an Industrial User's treatment facility. Bypass is prohibited, and the Department of Water Services may take enforcement action against an Industrial User for a bypass, unless:

(a.) Bypass was unavoidable to prevent loss of life, personal injury, or severe property damage,

(b.) There were no feasible alternatives to the bypass, such as the use of auxiliary treatment facilities, retention of untreated wastes, or maintenance during normal periods of equipment downtime. This condition is not satisfied if adequate back-up equipment should have been installed in the exercise of reasonable engineering judgement to prevent a bypass which occurred during normal periods of equipment downtime of preventative maintenance, and

(c.) The Industrial User submitted notices as required. If an Industrial User knows in advance of the need for a bypass, it shall submit prior notice to the Department, if possible, at least ten days before the date of the bypass. An Industrial User shall submit oral notice of an unanticipated bypass that exceeds applicable Pretreatment Standards to the Department within 24 hours from the time the Industrial User becomes aware of the bypass. A written submission shall also be provided within 5 days of the time the Industrial User becomes aware of the bypass. The written submission shall contain a description of the bypass and its cause; the duration of the bypass, including exact dates and times, and, if the bypass has not been corrected, the anticipated time it is expected to continue; and steps taken or planned to reduce, eliminate, and prevent reoccurrence of the bypass. The Department may waive the written report on a case-by-case basis if the oral report has been received within 24 hours.

### (6.) HAZARDOUS WASTE DISCHARGE

The Industrial User shall notify the Department of Water Services, the EPA Regional Waste Management Division Director, and State hazardous waste authorities in writing of any discharge into the POTW of a substance, which, if otherwise disposed of, would be a hazardous waste under 40 CFR part 261. Such notification must include the name of the hazardous waste as set forth in 40 CFR part 261, the EPA hazardous waste number, and type of discharge. Additional notification requirements may apply as required by 40 CFR 403.12 (p).

### B. MONITORING PROCEDURES

### (1.) SAMPLE COLLECTION AND ANALYSIS

Samples and measurements taken in compliance with the monitoring requirements of this permit shall be representative of the volume and nature of the monitored discharge during a normal production day and shall be taken as follows:

(a.) Be performed on timed composite* samples collected by an automatic sampler representative of the total wastewater flow discharged to the Metropolitan Government Sewerage System with the maximum time interval between samples no longer than fifteen (15) minutes.
(*see summary page)

(b.) Be conducted in accordance with the U.S. Environmental Protection Agency protocol. The results must be reported to the lowest detectable limit of the methodology. Samples are to be analyzed by a laboratory, certified by Metro Water Services for the required parameters.

(6)

(c.) **ONSITE ENVIRONMENTAL** must sample, analyze **WEEKLY and report MONTHLY** for the following parameters:

COMPOSITE GRAB

Biochemical Oxygen Demand (BOD)  pH
Suspended Solids  Oil & Grease (HEM)
Chromium
Cobalt  Tin
Copper  Zinc
Lead  Ammonia

(d.) **ONSITE ENVIRONMENTAL** must sample, analyze and report **MONTHLY** for the following parameters:

GRAB

| | |
|---|---|
| 2,4,6-Trichlorophenol | p-Cresol |
| Fluoranthene | o-Cresol |
| Bis(2-ethylhexyl) phthalate | n-Decane |
| n-Octadecane | Carbazole |

(e.) Provide the flow rate for which the results are indicative to the nearest 100 gallons per day.

(f.) Sampling, analysis, and report generation events will be conducted by third-party contractors wholly and completely outside of ONSITE ENVIRONMENTAL corporate structure and its ownership's interests, whether financial or familial.

(g.) Sampling events will be randomly chosen on a day of the week while process discharge is occurring and collected by the third-party without prior notification to ONSITE ENVIRONMENTAL personnel.

(h.) Daily discharge reports will be collated and submitted within monthly monitoring reports, listed per batch, to include discharge start and end times, and total batch volume discharged.

**(2.) SAMPLE LOCATION**

**ONSITE ENVIRONMENTAL SAMPLES SHALL BE COLLECTED FROM A BASIN EQUIPPED WITH A 60 DEGREE LARGE TRAPEZOIDAL FLUME. THIS BASIN IS LOCATED IN THE CONCRETE BLOCK ENCLOSURE DIRECTLY BEHIND THE MAINTENANCE FACILITY. THE X,Y,Z COORDINATES ARE:**
| 36°11'59.63"N | 86°47'3.72"W | 128m |

**"ALL NON-SANITARY WASTEWATER MUST BE DISCHARGED THROUGH THE METRO APPROVED SAMPLE POINT AS DESCRIBED IN THE INDUSTRIAL USERS PERMIT.**

**DISCHARGE OF NON-SANITARY WASTEWATER BY ANY OTHER MEANS OR AT ANY OTHER LOCATION MUST BE APPROVED IN WRITING BY THE DEPARTMENT. FAILURE TO DO SO WILL BE CONSIDERED A VIOLATION OF THE INDUSTRIAL USER'S PERMIT."**

(7)

### (3.) TEST PROCEDURES

(a.) Test procedures for the analysis of pollutants shall conform to regulations published pursuant to Section 304 (h) of the Clean Water Act of 1977, under which such procedures may be required.

(b.) Unless otherwise noted in the permit, all pollutant parameters shall be determined according to methods prescribed in Title 40 CFR, Part 136, as amended, promulgated pursuant to Section 304 (h) of the Act.

### (4.) MAINTENANCE OF RECORDS

Any Industrial User subject to the reporting requirements established in this section, shall maintain records of all information resulting from any monitoring activities required by this section. Such records shall include for all samples:

(a.) The date, exact place, method, and time of sampling and names of the persons taking the samples,

(b.) The date analyses were performed,

(c.) Who performed the analyses,

(d.) The analytical techniques/methods used, and

(e.) The results of such analyses,

(f.) A signed certification statement and completed Chain of Custody (COC), per 40 CFR 403.6(a)(2)(ii).

Any Industrial User required by this paragraph to submit a similar report to the State of Tennessee or U.S. EPA under the provisions of 40 CFR 403.12, may submit to the Director a copy of said report in lieu of a separate report to the Director provided that all information required by this permit is included in the report to the State of Tennessee or EPA.

### (5.) RECORDS RETENTION

Any Industrial User subject to the reporting requirements established in this permit shall be required to retain for a minimum of four (4) years any records of monitoring activities and results (whether or not such monitoring activities are required by this permit) and shall make such records available for inspection and copying by the Department of Water and Sewerage Services, the Division of Water Resources - Tennessee Department of Environment and Conservation, or the Environmental Protection Agency. This period of retention shall be extended during unresolved litigation regarding the permittee or when requested by the Department of Water and Sewerage Services, the Division of Water Resources -Tennessee Department of Environment and Conservation, or the Environmental Protection Agency. This period of retention may be extended during any unresolved litigation regarding the Industrial User or POTW or when requested by the Director.

(8)

**(6.)   RIGHT OF ENTRY BY CONTROL AUTHORITY**

As outlined in *§403.8 Pretreatment Program Requirements: Development and Implementation by POTW:*

(v) Carry out all inspection, surveillance and monitoring procedures necessary to determine, independent of information supplied by Industrial Users, compliance or noncompliance with applicable Pretreatment Standards and Requirements by Industrial Users. *Representatives of the POTW shall be authorized to enter any premises of any Industrial User in which a Discharge source or treatment system is located or in which records are required to be kept under §403.12(o) to assure compliance with Pretreatment Standards. Such authority shall be at least as extensive as the authority provided under section 308 of the Act.*

## C. PERMIT CHARACTERISTICS

### (1.) DURATION OF THE PERMIT

Wastewater discharge permits shall be issued for a period stated on the permit. Notwithstanding the foregoing, users becoming subject to a National Pretreatment Standard shall apply for new permits on the effective date of such National Pretreatment Standards. A user must apply in writing for a renewal permit within the period not more than ninety (90) days and not less than thirty (30) days prior to the expiration of the current permit. Provided further, that limitations or conditions of a permit are subject to modification or changes due to changes in applicable water quality standards, changes in Metro's NPDES permit, changes in the limitations of wastewater strength or POTW protection criteria, changes in other applicable law or regulation, or for other just causes.

### (2.) TRANSFER OF A PERMIT

Wastewater discharge permits are issued to a specific user for a specific operation. A wastewater discharge permit shall not be reassigned, transferred, or sold to a new owner, new user, or for different premises, without, at a minimum, prior notification to the Department of Water Services and provision of a copy of the existing control mechanism to the new owner or operator.

(9)

Case 3:25-cr-00138     Document 19     Filed 08/05/25     Page 79 of 120 PageID #: 120

## D. REPORTING

### (1.) MONITORING RESULTS

Industrial Compliance Reports shall be submitted by the permittee to the Environmental Compliance Section on a **MONTHLY** basis. A copy of the Industrial Compliance Report should be retained for the permittee's file. Industrial Compliance Reports must be signed by a principal corporate executive of at least the level of vice-president, a general partner or proprietor, or a principal municipal executive officer or ranking elected official, or his duly authorized representative. *All Industrial Compliance Reports shall be submitted to the Environmental Compliance Section within thirty (30) calendar days from the date of collection*. Industrial Compliance Reports, and any other communication relating to this permit, shall be submitted to:

> Environmental Compliance Section
> Metropolitan Department of Water & Sewerage Services
> 1360 County Hospital Road
> Nashville, Tennessee 37218

If sampling performed by an Industrial User indicates a violation, the user shall notify the Control Authority within the twenty-four (24) hours of becoming aware of the violation. The User shall also repeat the sampling and analysis to the Control Authority within thirty (30) days after becoming aware of the violation, except the Industrial User is not required to resample if:

(a.) The Control Authority performs sampling at the Industrial User at the frequency of at least once per month, or

(b.) The Control Authority performs sampling at the User between the time when the User performs its initial sampling and the time when the User receives the results of this sampling. [40 CFR Sec. 403.12 (g)(2)]

### (2.) REPORTING SCHEDULE

The first discharge monitoring report is due **November 1, 2023**. Additional monitoring reports must be received in this office on the 1st of each succeeding month.

All self-sampling reports must include the MWS supplied **CORPORATE SIGNATURE FORM**. A wet ink signature is required on this document. Failure to submit a wet ink signature copy will result in the report being returned to the I.U. as incomplete and may result in violation of I.U. permit reporting requirements.

### (3.) ADDITIONAL MONITORING BY THE PERMITTEE

If the permittee monitors any pollutant at the location(s) designated herein more frequently than required by this permit, using approved analytical methods as specified above, the results of such monitoring shall be included in the calculation and reporting of the values required in the Discharge Monitoring Report Form. Such increased frequency shall also be indicated.

### (4.) FALSIFYING REPORTS

Knowingly, making any false statement on any report required by the permit may result in the imposition of criminal penalties as provided for in Section 309 of the Federal Water Pollution Control Act, as amended.

(10)

## PART II

### A. NATIONAL PRETREATMENT STANDARDS

Certain Industrial Users are now or hereafter shall become subject to National Pretreatment Standards promulgated by the US Environmental Protection Agency specifying quantities or concentrations of pollutants or pollutant properties which may be discharged into the POTW. All **Industrial User's (I.U.'s)** subject to a National Pretreatment Standard for existing sources shall be (in compliance) within three (3) years following promulgation of the standards unless a shorter compliance time is specified in the standard. Compliance with National Pretreatment Standards for new sources shall be required upon regulation of the standard. New sources shall install and have in operating condition and shall "start-up" all pollution control equipment required to meet applicable pretreatment standards before beginning to discharge.

(1.) **"Pretreatment"** means the reduction of the amounts of pollutants, or the alteration of the nature of pollutant properties in wastewater before or instead of discharging, or otherwise introducing such pollutants into a POTW. **The reduction or alteration may be accomplished by physical, chemical, or biological processes, but [Industrial Users (I.U.)] may not dilute a discharge as a substitute for treatment.**

(2.) **Unless expressly authorized by a categorical standard, it is against the law for an industrial user to dilute its process water to increase its use or to substitute dilution as a partial or complete substitute for adequate treatment.** The control authority may impose mass limitations on I.U.'s that are using dilution to meet pretreatment standards.

### B. PROHIBITIONS ON STORM DRAINAGE AND GROUND WATER

Storm water, ground water, rainwater, street drainage, roof top drainage, basement drainage, sub-surface drainage, or yard drainage, if unpolluted shall not be discharged through direct or indirect connections to a community sewer unless a storm sewer or other reasonable alternative for removal of such drainage does not exist, and then only when such drainage is permitted by the user's wastewater discharge and the appropriate fee is paid for the volume thereof.

### C. LIMITATION ON RADIOACTIVE WASTE

No permittee shall discharge or permit to be discharged any radioactive water into a community sewer except:

(1.) When the user is authorized to use radioactive material by the Tennessee Department of Environment and Conservation or the Nuclear Regulatory Commission,

(2.) When the waste is discharged in strict conformity with applicable laws and regulations of the aforementioned agencies, or any other agency having jurisdiction, and

(3.) When a copy of permits received from said regulatory agencies have been filed with the Department of Water and Sewerage Services.

Case 3:25-cr-00138    Document 19    Filed 08/05/25    Page 81 of 120 PageID #: 122

## D. PROHIBITIVE DISCHARGE STANDARDS

(1.)   No permittee shall introduce into the publicly owned treatment works any of the following pollutants which acting either alone or in conjunction with other substances present in the POTW interfere with the operation of the POTW are as follows:

(a.)  Pollutants that create a fire or explosion hazard in the POTW, including, but not limited to, waste streams with a closed cup flashpoint of less than 140 degrees Fahrenheit or 60 degrees Centigrade using the test methods specified in 40 CFR 261.21,

(b.)  Pollutants which cause corrosive structural damage to the POTW, but in no case discharges with a pH lower than 5.0 or higher than 10.0,

(c.)  Solid or viscous pollutants in amounts which cause obstruction to the flow of the sewers, or other interference with the operation of or which causes injury to the POTW, including a waxy or other material which tend to coat and clog a sewer line or other appurtenances thereto,

(d.)  Any pollutant, including oxygen demanding pollutants (BOD, etc.) released in a discharge of such volume or strength as to cause interference in the POTW,

(e.)  Heat in amounts which will inhibit biological activity in the POTW resulting in interference, but in no case heat such quantities that the temperature of the influent at the treatment works exceeds 40 degrees Centigrade (104 degrees Fahrenheit).  Unless a higher temperature is allowed in the user's wastewater discharge permit, no user shall discharge into any sewer line or other appurtenance of the POTW wastewater with a temperature exceeding 65.5 degrees Centigrade (150 degrees Fahrenheit),

(f.)  Petroleum oil, non-biodegradable cutting oil, or products of mineral oil origin in amounts that will cause interference or pass through,

(g.) Pollutants which result in the presence of toxic gases, vapors, or fumes within the POTW in a quantity that may cause acute worker health and safety problems,

(h.)  Any trucked or hauled pollutants except at discharge points designated by the POTW,

(i.)  Noxious or malodorous liquids, gases, solids, or other wastewater which, either singly or by interaction with other wastes, are sufficient to create a public nuisance or a hazard to life, or to prevent entry into the sewers for maintenance or repair,

(j.) Wastewater which imparts color which cannot be removed by the treatment process, such as, but not limited to, dye wastes and vegetable tanning solutions, which consequently imparts color to the treatment plant's effluent, thereby violating Metro's NPDES permits,

(k.)  Sludges, screenings, or other residues from the pretreatment of industrial wastes,

(l.)  Wastewater causing, alone or in conjunction with other sources, the treatment plant's effluent to fail toxicity test,

(m.)  Detergents, surface-active agents, or other substances which that might cause excessive foaming in the POTW,

(n.)  Unused or outdated pharmaceuticals,

(o.) Antifreeze or antifreeze mixtures.

(12)

The aforesaid mentioned pollutants represent a general description of harmful or dangerous conditions and are in addition to such specific pollutants as may be identified and added from time to time to the Industrial User's Permit.

(2.) The permittee shall notify the Environmental Compliance Section on any of the following changes to the system no later than 180 days prior to change of discharge:

(a.) New introduction into such works of pollutants from any source which would be a new source, if such source were discharging pollutants,

(b.) New introduction of pollutants into such works from a source which would be subject to the Sewer Use Ordinance if it were discharging such pollutants,

(c.) A substantial change in the volume or character of pollutants being discharged into such works at the time the permit is issued.

(3.) This notice will include information on the quality and quantity of the wastewater introduced by the new source into the publicly owned treatment works, and on any anticipated impact on the effluent discharged from such works.

## PART III

## VIOLATIONS AND PENALTIES

Any person including, but not limited to industrial users, who does any of the following acts or omissions shall be subject to a civil penalty of up to ten thousand ($10,000) per day for each day during which the act or omission continues or occurs:

(1.) Violates an effluent standard or limitation imposed by a pretreatment program,

(2.) Violates the terms or conditions of a permit issued pursuant to a pretreatment program,

(3.) Fails to complete a filing requirement of a pretreatment program,

(4.) Fails to allow or perform an entry, inspection, monitoring or reporting requirement of a pretreatment program,

(5.) Fails to pay user or cost recovery charges imposed by a pretreatment program, or

(6.) Violates a final determination or order of the local hearing authority or local administrative officer.

(13)

## PART IV

### PERMIT SUMMARY

**ONSITE ENVIRONMENTAL** will be allowed to discharge excessive strength **COMPATIBLE** waste and, in lieu of pretreatment, pay a surcharge on the excess. This will be allowed if sufficient capacity remains to treat said waste at the receiving P.O.T.W. **ONSITE ENVIRONMENTAL** must notify the P.O.T.W., in writing, before using this option. Failure to report as required by this permit shall be deemed a violation and enforcement action shall be taken.

**ONSITE ENVIRONMENTAL** will be required to generate and maintain records on the disposal of their sludges and/or residuals. These records are to be accessible to this Department upon request.

**ONSITE ENVIRONMENTAL** must sample, analyze **WEEKLY** and report **MONTHLY** for the following parameters:

| COMPOSITE | | GRAB |
|---|---|---|
| Biochemical Oxygen Demand (BOD) | | pH |
| Suspended Solids | | Oil & Grease (HEM) |
| Chromium | | |
| Cobalt | Tin | |
| Copper | Zinc | |
| Lead | Ammonia | |

**ONSITE ENVIRONMENTAL** must sample, analyze and report **MONTHLY** for the following parameters:

GRAB

| | |
|---|---|
| 2,4,6-Trichlorophenol | p-Cresol |
| Fluoranthene | o-Cresol |
| Bis(2-ethylhexyl) phthalate | n-Decane |
| n-Octadecane | Carbazole |

All self-sampling reports must include the MWS supplied **CORPORATE SIGNATURE FORM**. A wet ink signature is required on this document. Failure to submit a wet ink signature copy will result in the report being returned to the I.U. as incomplete and may result in violation of I.U. permit reporting requirements.

The first discharge monitoring report is due **November 1, 2023**. Additional monitoring reports must be received in this office on the 1st of each succeeding month until this permit expires.

**ONSITE ENVIRONMENTAL** IS REGULATED BY THE METROPOLITAN CODE OF LAWS 15.60 AND 40 CFR 437, CENTRALIZED WASTE TREATMENT SUBCATEGORY D (OILS & ORGANICS) (NEW SOURCE) AND MUST MEET ALL LIMITS AND PROVISIONS SET FORTH IN THIS DOCUMENT.

**ONSITE ENVIRONMENTAL** permit number is **CP-0219**. This number is to be used in all correspondence with the Department of Water Services.

(14)

Case 3:25-cr-00138    Document 19    Filed 08/05/25    Page 84 of 120 PageID #: 125

**\*ONSITE ENVIRONMENTAL** IS AUTHORIZED TO COLLECT TIMED COMPOSITE SAMPLES. PAST HISTORY OF SAMPLING HAS DEMONSTRATED THAT DUE TO NATURE OF DISCHARGE THERE IS INSIGNIFICANT DIFFERENCE BETWEEN FLOW-PROPORTIONAL AND TIMED COMPOSITE SAMPLING WITH FIFTEEN MINUTE INTERVALS.

IN ADDITION TO SAMPLING, **ONSITE ENVIRONMENTAL** MUST SUBMIT TO THIS OFFICE AN ANNUAL PERIODIC CERTIFICATION STATEMENT DUE **APRIL 1, 2024; AND EACH SUBSEQUENT APRIL 1,** UNTIL THIS PERMIT EXPIRES AS PER FEDERAL REGULATIONS 40 CFR 437, CENTRALIZED WASTE TREATMENT.

(a) Initial Certification Statement for this subpart means a written submission to the appropriate permitting authority (either the local control authority (the POTW) or NPDES permit writer) that is signed by the responsible corporate officer as defined in 40 CFR 403.12(l) or 40 CFR 122.22. The statement must:

> (1) List and describe the subcategories of wastes accepted for treatment at the facility,

> (2) List and describe the treatment systems in-place at the facility and conditions under which the treatment systems are operated for the subcategories of wastes accepted for treatment at the facility, and

> (3) Include information and supporting data establishing that these treatment systems will achieve equivalent treatment.

(b) Periodic Certification Statement for this subpart means a written submission to the appropriate permitting authority (the local control authority (the POTW) or NPDES permit writer) which certifies that the facility is operating its treatment systems to provide equivalent treatment as set forth in the initial certification. If the facility has modified its treatment systems, the facility should submit a description of the modified systems and information and supporting data to establish that the modified system will achieve equivalent treatment. The periodic certification statement must be signed by the responsible corporate officer as defined in 40 CFR 403.12(l) or 40 CFR 122.22,

(c) On-site Compliance Paperwork for this subpart means data or information retained in the offices of the facility which supports the initial and periodic certification statements. This Paperwork must:

> (1) List and describe the subcategory wastes being accepted for treatment at the facility,

> (2) List and describe the treatment systems in-place at the facility, modifications to the treatment systems and the conditions under which the systems are operated for the subcategories of wastes accepted for treatment at the facility,

> (3) Provide information and supporting data establishing that these treatment systems will achieve equivalent treatment,

> (4) Describe the procedures it follows to ensure that its treatment systems are well-operated and maintained, and

> (5) Explain why the procedures it has adopted will ensure its treatment systems are well-operated and maintained.

(15)

# Attachment E



## ONSITE ENVIRONMENTAL
### Responsible Waste Management

# FACILITY OPERATING PLAN
### October 1, 2023

**Prepared for:**
**AllWaste Onsite, LLC dba**
**Onsite Environmental**
**1501 Baptist World Center Drive**
**Nashville, TN 37207**

**Prepared by:**
**Finger Lynes Engineering, LLC**
**PO Box 150938**
**Nashville, TN 37215**

Case 3:25-cr-00138    Document 19    Filed 08/05/25    Page 87 of 120 PageID #: 128

# Onsite Environmental
## 1501 Baptist World Center Drive, Nashville, Tennessee 37207

# Table of Contents

1. Purpose
2. Scope
3. Reference
4. Sampling (Section 1 of the Order)
5. Personnel (Section 4.b. of the Order)
6. Plant and Equipment Upgrades (Section 5 of the Order)
7. Operational Changes (Section 6 of the Order)
8. Corrective Actions (Section 7 of the Order)

Attachments
1. Sampling Schedule
2. Parameter Limits
3. Receiving Forms
4. Prior-To-Discharge Log
5. Discharge Monitoring Log
6. Plant Improvements
7. Wilks Analyzer
8. Process Form

Changes since last version 7/26/23:

1. Changed reference from Grease to GFW
2. Changed reference from Hydrocarbons to PCW
3. Removed Receiving Log and inserted Receiving Form for GFW, Leachate, and PCW
4. Inserted Plant Improvements
5. Removed Acceptance Criteria
6. Changed SOP to Treatment Process
7. All materials received require a generic profile or NMA

Case 3:25-cr-00138    Document 19    Filed 08/05/25    Page 89 of 120 PageID #: 130

# Onsite Environmental
### 1501 Baptist World Center Drive, Nashville, Tennessee 37207

# Facility Operating Plan

1. **Purpose**

   This Facility Operating Plan (FOP) addresses the items in Agreed Order 2023-02 (Order) to describe how the Order will be implemented, and to provide an ongoing document for the processing of waste materials to meet the facility's permit conditions.

2. **Scope**

   The FOP addresses the items in the Order associated with the facility at 1501 Baptist World Center Drive with the understanding that Onsite Environmental is constructing a new facility at 2826 Whites Creek Pike. The Whites Creek facility is anticipated to be operational in late 2024 or early 2025.

3. **Reference**

   Agreed Order 2023-02 between AllWaste Onsite, LLC dba Onsite Environmental (Onsite) and Metro Department of Water and Sewerage Services (Metro).

4. **Sampling (Section 1 of the Order)**

   A summary of the sampling requirements is presented in Attachment 1. The parameter surcharge thresholds and limits are summarized in Attachment 2.

5. **Personnel (Section 4.b. of the Order)**

   The new plant manager and supervisor have been hired, and the laboratory technician position has been filled.

6. **Plant and Equipment Upgrades (Section 5 of the Order)**

   6.1. The upgraded equipment includes (IV5.a):

   6.1.1. Signature Ultrasonic flowmeter

   6.1.2. TIENet 301 pH and temperature sensor with interface

   6.1.3. ISCO 5800 Refrigerated Sampler

   6.2. MWS approved the upgraded equipment. Documentation of maintenance as specified by the manufacturer will be maintained, and the flowmeter will be maintained to meet MWS requirements. (IV.5.b.)

   6.3. The pH meter will be used to monitor batch discharges and recorded as part of operating record as required in Sampling, Section IV.1.g. Conductivity will not be measured. (IV.5.c.)

Case 3:25-cr-00138   Document 19   Filed 08/05/25   Page 90 of 120 PageID #: 131

6.4. The effluent flume as located in a lockable fence enclosure allowing access only to those who are collecting samples, except for daily cleaning of the pH probe. (IV.5.d.)

6.5. The flume area has video surveillance, which will be retained for 90 days. (IV.5.e.)

6.6. See Attachment 6 for facility and treatment improvements. (IV.5.f. and IV.5.g.)

7. **Operational Changes (Section 6 of the Order)**

7.1. A Daily Discharge Log will be maintained electronically and is available to MWS remotely. A copy of log will be submitted with the monthly monitoring report as required in IV.1.g. See Attachment 5. (IV.6.a.)

7.2. Documentation for maintenance and calibration of all instrumentation (flow meter and pH meter) according to the manufacturer's recommendations will be created upon installation of the equipment. (IV.6.b.)

7.3. The sampling and reporting are specified in Attachment 1. (IV.6.c.)

7.4. The New Material Approval (NMA) will be implemented for new waste streams. Waste streams with an NMA will be recertified annually in the anniversary month of their approval and within 30 days of the prior approval. (IV.6.d.)

7.5. Each load received will be entered into the corresponding Receiving Log, that is, GFW (Grease Food Water) Receiving Log, Leachate Receiving Log, and PCW (Petroleum Contacted Water) Receiving Log, Attachment 3.

7.6. Prior to discharge, analytical screening will be performed. The Wilks Infra Cal2 Analyzer measures Fats, Oils, and Grease (FOG) ranging from 1 part per million (ppm) to 10 percent. The Wilks meter will be used to monitor FOG, which equates to HEM or O&G, prior to discharge. Other parameters for batch screening prior to discharge are pH, ammonia, copper, and lead. The screening prior to discharge will be conducted by the laboratory technician, plant manager, or plant supervisor. Documentation of the Prior-To-Discharge Log is maintained in Attachment 4, and the Discharge Monitoring Log is Attachment 5. Both Prior-To-Discharge and the Discharge Monitoring Log will be submitted with the monthly report. (IV.6.e.)

8. **Corrective Actions (Section 7 of the Order)**

8.1. Solids and HEM

8.1.1. The volume and discharge rates shall be commensurate with the treatment process to produce the appropriate quality effluent. (IV.7.a.i.)

8.1.2. Improvements in plant processes have been identified that will result in increasing the plant handling capacity and separation time. See Attachment 6 for a list of plant improvements, some have been completed and others are scheduled for completion. (IV.7.a.ii.)

Onsite Nashville FOP                                5

Case 3:25-cr-00138    Document 19    Filed 08/05/25    Page 91 of 120 PageID #: 132

8.1.3. The Treatment Process descriptions for GFW, Leachate, and PCW have been developed to make the process adjustments to improve treatment efficiency. See Attachment 9. (IV.7.a.iii.)

8.1.4. The New Material Approval (NMA) SOP is in place to pre-screen and reject waste streams with high contaminant discharge potential, including precipitates from pH adjustment. (IV.7.a.iv.)

8.2. Ammonia

8.2.1. Adjustments have been made to the existing treatment process to limit ammonia discharge to 300 mg/L. See Table 5. (IV.7.b.i.)

8.2.2. The New Material Approval (NMA) process is in place to pre-screen and reject waste streams with amounts of ammonia and/or metals greater than the estimated limits of the existing treatment system. (IV.7.b.ii.)

8.2.3. Plant treatment, design, capacity, and operational changes addressing ammonia and/or metal removal are identified in the Process Descriptions for Leachate and PCW. (IV.7.b.iii.)

8.2.4. The physical changes in the plant and the operational changes in the processes will make the volume and flow rate commensurate with the ability of the process to address high contaminant discharge potential, including precipitates from pH adjustment to meet the discharge parameters. (IV.7.a.iv.)

Case 3:25-cr-00138 Document 19 Filed 08/05/25 Page 92 of 120 PageID #: 133

# Attachment 1

# Sampling Schedule

# Onsite Environmental
### 1501 Baptist World Center Drive, Nashville, Tennessee 37207

| Sampling Schedule | | | | |
|---|---|---|---|---|
| Frequency | Parameter | Sample Type | Limits | Reference |
| Weekly | Total Suspended Solids | Composite | See Attachment 2 | IV.1.a. |
| | BOD | | | |
| | Ammonia | | | |
| | Categorial Metals (2) | | | |
| | HEM (Oil & Grease) (3) | Grab | | |
| Monthly | Categorical Organics (4) | Composite | See Attachment 2 | IV.1.b. |

Notes:
   (1) As stated in Section IV of the Order.
   (2) 40 CFR 437.42(e), Subpart D - Combined waste receipts from Subpart B (Oils) and Subpart C (Organics). The oils received by Onsite are oily wastewaters, oil/water emulsions, and oily sludges and solids, and the organics received by Onsite are landfill leachate.
   (3) HEM = Hexane Extractable Materials
   (4) 40 CFR 437.42(e), Subpart D, combined waste receipts from subparts A
   (5) Sampling, analysis, and report generation will be conducted by third-party contractors (IV.1.c)
      a. Sampling - Phoenix Environmental Engineers, Inc., Nashville, TN
      b. Analysis - Pace Analytical Services, Inc., Mt. Juliet, TN
      c. Report Generation - Finger Lynes Engineering, LLC., Nashville, TN
   (6) Sampling events will be randomly chosen on a day of the week while process discharge is occurring and collected by Phoenix Environmental Engineers without prior notification to Onsite personnel. (IV.1.d.)
   (7) Composite sampling will be conducted by automatic sampler and either set to take aliquots every 15 minutes for 24 hours or a flow-weighted composite based on the flow meter. (IV.1.e.)
   (8) Reports will be provided to MWS in the same manner as existing permit CP-0219. (IV.1.f.)
   (9) Daily discharge reports will be collated and submitted with in the monthly monitoring reports, listed per batch, to include discharge start and end times, and total batch volume discharged. (IV.1.g.)

Case 3:25-cr-00138    Document 19    Filed 08/05/25    Page 94 of 120 PageID #: 135

# Attachment 2

# Parameter Limits

Case 3:25-cr-00138    Document 19    Filed 08/05/25    Page 95 of 120 PageID #: 136

## Onsite Environmental
### 1501 Baptist World Center Drive, Nashville, Tennessee 37207

| Parameter Limits (1) | | | | |
|---|---|---|---|---|
| Frequency | Parameter | Concentration | | Basis |
| Weekly | Total Suspended Solids | 325 (2) | | CP-0219 |
| | BOD | 300 (2) | | CP-0219 |
| | Ammonia | 300 (3) | | CP-0219 |
| | Oil & Grease | 100 (2) | | CP-0219 |
| | **Categorial Metals (4)** | **Max. Daily** | **Max. Mo. Avg.** | |
| | Chromium, total | 0.947 | 0.487 | 437.42(e) |
| | Cobalt | 56.4 | 18.8 | 437.42(e) |
| | Copper | 0.405 | 0.301 | 437.42(e) |
| | Lead | 0.222 | 0.172 | 437.42(e) |
| | Tin | 0.249 | 0.146 | 437.42(e) |
| | Zinc | 6.95 | 4.46 | 437.42(e) |
| Monthly | **Categorical Organics (4)** | **Max. Daily** | **Max. Mo. Avg.** | |
| | Bis(2-ethlhexyl) phthalate | 0.267 | 0.158 | 437.42(e) |
| | Carbazole | 0.392 | 0.276 | 437.42(e) |
| | o-Cresol | 1.92 | 0.561 | 437.42(e) |
| | p-Cresol | 0.698 | 0.205 | 437.42(e) |
| | n-Decane | 5.79 | 3.31 | 437.42(e) |
| | Fluoranthene | 0.787 | 0.393 | 437.42(e) |
| | n-Octadecane | 1.22 | 0.925 | 437.42(e) |
| | 2,4,6-Trichlorophenol | 0.155 | 0.106 | 437.42(e) |

Notes:

(1) All units are mg/L
(2) Surcharge threshold
(3) Ammonia surcharge threshold is 30 mg/L, limit is 300 mg/L.
(4) 40 CFR 437.42(e), Combined waste receipts from subparts b (Oils) and c (Organics), for existing sources
(5) Categorical metals, but not required by MWS permit: Arsenic, Cadmium, Mercury per A. Welch, 06/16/23
(6) Categorical Organics, but not required by MWS permit: Acetone, Acetophenone, Phenol, Pyridine per A. Welch, 06/16/23

Case 3:25-cr-00138   Document 19   Filed 08/05/25   Page 96 of 120 PageID #: 137

# Attachment 3

# Receiving Logs

Case 3:25-cr-00138   Document 19   Filed 08/05/25   Page 97 of 120 PageID #: 138

## Onsite Environmental
### 1501 Baptist World Center Drive, Nashville, Tennessee 37207

| RECEIVING FORM - GFW | |
| --- | --- |
| DATE | |
| TIME | |
| OFF-LOADED BY | |
| HAULER | |
| TRUCK NUMBER | |
| GENERATOR & LOCATION | |
| MANIFEST NUMBER(S) | |
| VOLUME (GALLONS) | |
| FINGERPRINT TEST (Y/N) | |
| LOAD ACCEPTED (Y/N) | |
| TRANSFERRED TO TANK # | |
| COMMENTS | |

GFW - Grease Food Water

Case 3:25-cr-00138    Document 19    Filed 08/05/25    Page 98 of 120 PageID #: 139

## Onsite Environmental
### 1501 Baptist World Center Drive, Nashville, Tennessee 37207

| RECEIVING FORM - LEACHATE | |
|---|---|
| DATE | |
| TIME | |
| OFF-LOADED BY | |
| HAULER | |
| TRUCK NUMBER | |
| GENERATOR & LOCATION | |
| MANIFEST NUMBER(S) | |
| VOLUME (GALLONS) | |
| FINGERPRINT TEST (Y/N) | |
| LOAD ACCEPTED (Y/N) | |
| TRANSFERRED TO TANK # | |
| COMMENTS | |

Case 3:25-cr-00138  Document 19  Filed 08/05/25  Page 99 of 120 PageID #: 140

# Onsite Environmental
### 1501 Baptist World Center Drive, Nashville, Tennessee 37207

| RECEIVING FORM - PCW | |
|---|---|
| DATE | |
| TIME | |
| OFF-LOADED BY | |
| HAULER | |
| TRUCK NUMBER | |
| GENERATOR & LOCATION | |
| MANIFEST NUMBER(S) | |
| VOLUME (GALLONS) | |
| FINGERPRINT TEST (Y/N) | |
| LOAD ACCEPTED (Y/N) | |
| TRANSFERRED TO TANK # | |
| COMMENTS | |

PCW - Petroleum Contacted Water

Case 3:25-cr-00138    Document 19    Filed 08/05/25    Page 100 of 120 PageID #: 141

# Attachment 4

# Prior-To-Discharge Log

# Onsite Environmental
## 1501 Baptist World Center Drive, Nashville, Tennessee 37207

## Prior-To-Discharge Log

| Date | Batch ID | pH | Wilks O&G | Ammonia | Copper | Lead | | Person |
|------|----------|-----|-----------|---------|--------|------|---|--------|
| | | | | | | | | |
| | | | | | | | | |
| | | | | | | | | |
| | | | | | | | | |
| | | | | | | | | |
| | | | | | | | | |
| | | | | | | | | |
| | | | | | | | | |
| | | | | | | | | |
| | | | | | | | | |
| | | | | | | | | |
| | | | | | | | | |
| | | | | | | | | |
| | | | | | | | | |
| | | | | | | | | |
| | | | | | | | | |
| | | | | | | | | |
| | | | | | | | | |
| | | | | | | | | |
| | | | | | | | | |
| | | | | | | | | |
| | | | | | | | | |
| | | | | | | | | |
| | | | | | | | | |
| | | | | | | | | |
| | | | | | | | | |
| | | | | | | | | |
| | | | | | | | | |
| | | | | | | | | |
| | | | | | | | | |
| | | | | | | | | |
| | | | | | | | | |
| | | | | | | | | |

Notes:
1. Batch ID: GFW (Grease Food Water), L (Leachate), PCW (Petroleum Contact Water)
2. Identify combined batches with multiply letters, such as GFW + PCW

Case 3:25-cr-00138    Document 19    Filed 08/05/25    Page 102 of 120 PageID #: 143

# Attachment 5

# Discharge Monitoring Log

Case 3:25-cr-00138    Document 19    Filed 08/05/25    Page 103 of 120 PageID #: 144

# Onsite Environmental
### 1501 Baptist World Center Drive, Nashville, Tennessee 37207

| Date | Time | Flow, gal | pH | Wilks O&G | Comments | Person |
|---|---|---|---|---|---|---|
| | | | | | | |
| | | | | | | |
| | | | | | | |
| | | | | | | |
| | | | | | | |
| | | | | | | |
| | | | | | | |
| | | | | | | |
| | | | | | | |
| | | | | | | |
| | | | | | | |
| | | | | | | |
| | | | | | | |
| | | | | | | |
| | | | | | | |
| | | | | | | |
| | | | | | | |
| | | | | | | |
| | | | | | | |
| | | | | | | |
| | | | | | | |
| | | | | | | |
| | | | | | | |
| | | | | | | |
| | | | | | | |
| | | | | | | |
| | | | | | | |
| | | | | | | |
| | | | | | | |
| | | | | | | |
| | | | | | | |
| | | | | | | |
| | | | | | | |

**Discharge Monitoring Log**

Notes:
1. Batch ID: GFW (Grease Food Water), L (Leachate), PCW (Petroleum Contact Water)
2. Identify combined batches with multiply letters, such as GFW + PCW

Case 3:25-cr-00138    Document 19    Filed 08/05/25    Page 104 of 120 PageID #: 145

# Attachment 6

# Plant Improvements

Case 3:25-cr-00138    Document 19    Filed 08/05/25    Page 105 of 120 PageID #: 146

# Onsite Environmental
### 1501 Baptist World Center Drive, Nashville, Tennessee 37207

| Plant Improvements | | | |
|---|---|---|---|
| **Area** | **Item** | **Date** | **Status** |
| GFW | Self-dumping hopper added | 5/23 | Complete |
| GFW | Decanter repair | 6/23 | Ongoing |
| Leachate | Chemical injection/adjustment installed | 5/23 | Complete |
| Leachate | Blowers added | 5/23 | Complete |
| Leachate | Airline system/diffusers added | 5/23 | Complete |
| PCW | Offload/wash-out pit defined | 6/23 | Complete |
| PCW | Receiving tank | 6/23 | Complete |
| PCW | Mixers added to treatment tanks | 6/23 | Complete |
| PCW | Tank battery demolition | 5/23 | Complete |
| PCW | Self-dumping hopper added | 5/23 | Complete |
| PCW | Plumbing re-engineered | 5/23 | *Ongoing* |
| PCW | Decanter repair | 4/23 | *Ongoing* |
| Stormwater Pond | Pump added SW pond to transfer stormwater to treatment areas | 5/23 | Complete |
| Plant | Power expanded through plant | 7/23 | *Ongoing* |
| Plant | Portable power added for pumps | 5/23 | Complete |
| Plant | Portable pumps added for mobility | 5/23 | Complete |
| Plant | Materials brought in for road improvement | | *Ongoing* |
| Plant | Lab technician added | 7/23 | Complete |
| Plant | Flume fenced for security | 5/23 | Complete |
| Sample Room | Equipment upgraded | 7/23 | *Ongoing* |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |

PCW - Petroleum Contacted Water
GFW - Grease Food Water

Case 3:25-cr-00138    Document 19    Filed 08/05/25    Page 106 of 120 PageID #: 147

# Attachment 7

# Wilks Analyzer

Case 3:25-cr-00138     Document 19     Filed 08/05/25     Page 107 of 120 PageID #: 148

# Onsite Environmental
## 1501 Baptist World Center Drive, Nashville, Tennessee 37207

### Wilks InfraCa2 Analyzer for Oil & Grease

# FOG Testing Measurements Now Range from 1 PPM to 10 Percent with Wilks InfraCal2 Analyzers

The Wilks InfraCal 2 Analyzers provide accurate, easy, on-site analysis to help both regulators and industry comply with permit requirements and avoid potentially costly fines. These instruments now feature a multiple calibration option that allows for a wider measurement range – as low as 1 ppm up to 10 percent, providing greater flexibility for pretreatment operators and regulators to test a variety of samples.

NORWALK, CT (PRWEB) DECEMBER 04, 2014

Industrial and food processing plants that have high levels of fats, oil, and grease (FOG) in their effluents face strict wastewater regulations The Wilks InfraCal 2 Analyzers provide accurate, easy, on-site analysis to help both regulators and industry comply with permit requirements and avoid potentially costly fines These instruments now feature a multiple calibration option that allows for a wider measurement range – as low as 1 ppm up to 10 percent, providing greater flexibility for pretreatment operators and regulators to test a variety of samples. The InfraCal 2 Analyzers are compact, fixed-filter, mid-infrared monitors with no moving parts. They weigh less than 5 pounds and are battery operable This makes them portable, sturdy, and operational in a range of ambient conditions typically found in industrial and field environments



InfraCal 2 Oil in Water Analyzer

With InfraCal2 Analyzers, on-site results are attained in 10-15 minutes, eliminating the wait and high cost for remote lab results which can take several days to a week A typical cost per test is in the $5 USD range Further, the measurement procedure is simple enough for an operator with minimal training to do the analysis

With over 3,500 in use worldwide, the Wilks InfraCal Analyzers have been a reliable standard in the highly regulated petroleum industry for measuring oil in water for over 20 years In addition to extended measurement ranges, the devices are equipped with unlimited data storage that tags measurements with analyst, date and time, and security features with different user access levels.

For further information on the InfraCal for measuring fats, oils and grease levels, contact Wilks – A Spectro Scientific Company, 25 Van Zant Street, Ste. 8F, Norwalk, CT 06855 USA, TEL: 203-855-9136, FAX: 203-838-9868, Web Site: http://www.WilksIR.com – or download information directly at http://wilksir.com/applications/oil-in-water-soil-testing/fog-in-wastewater.html
# # #

Case 3:25-cr-00138    Document 19   Filed 08/05/25    Page 108 of 120 PageID #: 149

# Attachment 8

# Process Form

Case 3:25-cr-00138 Document 19 Filed 08/05/25 Page 109 of 120 PageID #: 150

# Process Form

| | |
|---|---|
| Batch No.[1] | |
| Material | |
| Date Start | |
| Time Start | |
| Treated By | |
| Transfer from Tank No. 1 | |
| Transfer from Tank No. 2 | |
| Transfer from Tank No. 3 | |
| Transfer to Tank No. | |
| Treatment Volume | |
| pH Start | |
| pH End | |
| Ammonia Start | |
| Ammonia End | |
| Discharge (Y/N) | |
| Discharge Volume | |
| Discharge Date | |
| Discharge Time | |
| Comments | |

[1]Batch No.: GFW-YYMMDD-X, Example: The first batch of Grease Food Water on 6/6/23: GFW-230606-1

Case 3:25-cr-00138     Document 19     Filed 08/05/25     Page 110 of 120 PageID #: 151

# Attachment 9

# Process Descriptions

Case 3:25-cr-00138    Document 19    Filed 08/05/25    Page 111 of 120 PageID #: 152

# Grease Food Water (GFW) Treatment Process

1. **Waste Stream Approval**
   1.1. Waste Generator submits:
      1.1.1. A completed Generic Profile or New Material Approval (NMA) is submitted for review and acceptance by the Plant Manager.
      1.1.2. Generic Profile to be recertified annually or sooner if the generating process and/or if chemical constituents change.
      1.1.3. Only approved waste streams are allowed to be scheduled for acceptance and process into the Nashville facility.
   1.2. Scheduling
      1.2.1. Grease loads picked up by Onsite are scheduled prior to pick-up.
      1.2.2. Non-Onsite loads are scheduled according to a pre-arranged agreement with the transporter.

2. **Fingerprint Analysis**
   2.1. Visual - Color, odor, layers, solids.
   2.2. Record Keeping – Record all information on GFW Receiving Form.
   2.3. Maintain and store 4 oz. sample for 15 days of any **suspected non-confirming** load.

3. **Receiving**
   3.1. Truck arrives to the Nashville facility.
   3.2. Each load has an Onsite manifest or equivalent.
   3.3. Upon arrival, each load is inspected and sampled by the lab technician.
   3.4. The lab technician conducts a fingerprint analysis of the inbound sample for color, odor, layers, solids and records the results on the GFW Receiving Form.
   3.5. If the lab technician identifies non-conformity with the fingerprint analysis, he will notify the Plant Manager.
   3.6. The Plant Manager may define steps to accept the load, such as, portioning of the load per batch, or offloading to a quarantine tank.
   3.7. If rejected, take a 4 oz. sample, keep the sample for 15 days, and return the load to the generator.
   3.8. If accepted, offload.

4. **Offload**
   4.1. The load is discharged from the truck to receiving tank GT-1.

5. **Batch Process**
   5.1. Create a Process Form.
   5.2. After the grease waste stream has settled, the grease should break into four layers: grease, rag layer, water, solids.
   5.3. The grease from waste materials are pumped through a screen.
   5.4. The water is transferred to a treatment tank.
   5.5. When clear water appears greasy, close the valve.
   5.6. Add lime and/or polymer to the treatment tank.
   5.7. Test the pH.
   5.8. Adjust the pH with caustic or lime slurry.
   5.9. The treated water is allowed to settle at least 30 min.
   5.10.    Test the treated water.

Case 3:25-cr-00138    Document 19    Filed 08/05/25    Page 112 of 120 PageID #: 153

# GFW Treatment Process (continued)

5.11.      If pH is between 5.0 and 9.0, water can be decanted and transferred to the effluent storage tank.

5.12.      If acceptable, the clear water is transferred to the effluent storage tanks.

5.13.      If the water is not acceptable, retreat.

5.14.      The bottom solids are transferred for solidification.

5.15.      Add water as necessary to get a consistent thickness to pump sludges.

5.16.      Pump the sludge to the decanter.

5.17.      The solids are solidified for disposal.

5.18.      The water is transferred to storage for processing later.

5.19.      The grease is transferred to a storage tank.

5.20.      The grease is processed.

5.21.      The grease is either sold as a commodity or solidified for disposal.

5.22.      Rinse the decanter at the end of the shift to remove debris.

5.23.      Complete the Process Form.

6. **Maintenance**

    6.1. Grease Receiving Tanks emptied every 30-days.

    6.2. *Bottoms, sludges, and debris* will be removed for disposal.

    6.3. *Boilers* are inspected by a third party on an annual basis.

       6.3.1. Boiler and ancillary equipment are visually inspected monthly.

    6.4. *Pumps* are inspected monthly per manufacturers recommendation.

       6.4.1. Visual inspection of wear and tear of pumps P-5.

       6.4.2. Clean debris from pump

       6.4.3. Open belt cover to inspect belts for wear and tear.

       6.4.4. Visual integrity inspection of impellers.

       6.4.5. Drain bearings and seal hub plugs.

       6.4.6. Grease and lube as needed.

    6.5. *Decanter* is inspected quarterly per manufacturer recommendation.

       6.5.1. Visual inspection of wear and tear.

       6.5.2. Inspect belts for wear.

       6.5.3. Lube bearings.

       6.5.4. Look for debris that may cause obstructions.

    6.6. *Shaker screen* monthly inspection.

       6.6.1. Visual inspection of wear and tear.

       6.6.2. Inspect the mesh screen.

       6.6.3. Inspect the springs.

       6.6.4. Inspect the bolt tension rings.

    6.7. *Motors* are inspected monthly per manufacturer recommendation.

       6.7.1. Visually inspect for wear and tear.

       6.7.2. Clean the motor from debris.

       6.7.3. Add grease as needed.

    6.8. *pH probe* is inspected and calibrated per manufacturer recommendation.

       6.8.1. Visual inspection daily for debris.

       6.8.2. Cleaned daily.

       6.8.3. Calibrated daily or before start of shift.

       6.8.4. Calibrated by vendor semi-annually.

Case 3:25-cr-00138    Document 19    Filed 08/05/25    Page 113 of 120 PageID #: 154

# GFW Treatment Process (continued)

6.9. *Flow meter* is inspected and calibrated per manufacturer recommendation.

    6.9.1. Visual inspection daily.

    6.9.2. Clean flume daily.

    6.9.3. Calibrate weekly by Onsite staff.

    6.9.4. Calibrate by vendor semi-annually.

7. **Chemicals**

    7.1.1. Caustic (Sodium Hydroxide)

    7.1.2. Sulfuric Acid

    7.1.3. Lime (Calcium Hydroxide)

    7.1.4. Cationic Polymer

    7.1.5. Anionic Polymer

    7.1.6. SDS's for reagents are available in the Plant Manager's Office.

8. **Personal Protective Equipment**

    8.1.1. Hard Hat

    8.1.2. Safety Glasses always and Face Shield as needed.

    8.1.3. Steel toe boots

    8.1.4. Gloves (nitrile and neoprene gloves are recommended).

    8.1.5. Ear protection when exposed to sounds that are greater than 85 decibels.

    8.1.6. Avoid breathing toxic vapors, fumes, or dust. Inquire about Permissible Exposure Limits (PELs) with the EHS Director.

9. **Solid Waste Management**

    9.1. Contact the EHS Director for waste disposal of tank solids from clean-out and any unused reagents.

Case 3:25-cr-00138    Document 19    Filed 08/05/25    Page 114 of 120 PageID #: 155

# Leachate Treatment Process

1. **Waste Stream Approval**
   1.1. Waste Generator submits:
      1.1.1.  A completed Profile, New Material Approval (NMA) form, sample, and analytical results.
      1.1.2.  The NMA (New Materials Approvals) team reviews all submitted information for approval.
      1.1.3.  Only approved waste streams are allowed to be scheduled for acceptance and process into the Nashville facility.
      1.1.4.  Profile to be recertified annually or sooner if generating process and/or chemical constituents change.
   1.2. Scheduling
      1.2.1.  Leachate loads picked up by Onsite are scheduled prior to pick-up.
      1.2.2.  Non-Onsite loads are scheduled according to a pre-arranged agreement with the transporter.

2. **Fingerprint Analysis**
   2.1. Visual - Color, odor, layers, solids
   2.2. Analysis – pH, Ammonia
   2.3. Record Keeping – Record all information on Receiving Form.
   2.4. Maintain and store 4 oz. sample for 15 days of any suspected non-confirming load.

3. **Receiving**
   3.1. Truck arrives to the Nashville facility.
   3.2. Each load has an Onsite manifest or equivalent documentation.
   3.3. Upon arrival, the lab technician reviews the manifest, inspects the load, collects a sample, and completes the Receiving Form.
   3.4. The lab technician conducts a fingerprint analysis.
   3.5. The lab technician notifies the Plant Manager of any non-conformity resulting from the fingerprint analysis.
   3.6. The Plant Manager may take steps to accept the load, such as, portioning of the load, pretreatment, or offloading to a quarantine tank.
   3.7. If rejected, take a 4 oz. sample, return the load to the generator, and keep the sample for 30 days.
   3.8. If accepted, offload into one of the three Receiving Tanks.

4. **Offload**
   4.1. The leachate load is transferred from the truck to leachate tanks.
   4.2. Record the transfer on the Receiving Form.

5. **Batch Process**
   5.1. Create a Leachate Batch.
   5.2. Begin to complete the Process Form.
   5.3. Begin aeration with diffusers and blowers.
   5.4. Sample from the leachate tank and test for pH and ammonia and record.
   5.5. Add sodium hydroxide or hydrated lime to elevate the pH.
   5.6. Continue to aerate and circulate.
   5.7. Recheck the pH and ammonia.

Case 3:25-cr-00138    Document 19    Filed 08/05/25    Page 115 of 120 PageID #: 156

## Leachate Treatment Process (continued)

5.8. If the ammonia level is below 300 mg/L and pH is acceptable turn off aeration and allow the batch to settle for at least 30 min.

5.9. Transfer the water to effluent storage tanks for discharge.

5.10.     If not acceptable, retreat.

5.11.     If acceptable, discharge.

5.12.     Complete the Process Form.

6. Maintenance

6.1. Leachate Receiving Tanks emptied every 30-days.

    6.1.1.  *Leachate Tanks* are LT-1, LT-2, and LT-3.

6.2. *Bottoms, sludges, and debris* will be removed for disposal. If a substantial quantity of materials is present, bottoms/sludge removal will occur every 2 weeks or more frequently as needed.

6.3. *Diffusers* visually inspected and tested for integrity and proper function.

    6.3.1.  Eight (8) diffusers per tank.

6.4. *Pump* inspected monthly per manufacturers recommendation.

    6.4.1.  Visual inspection of wear and tear of pump P-4.

    6.4.2.  Clean debris from the pump

    6.4.3.  Open belt cover to inspect belts for wear and tear.

    6.4.4.  Visual integrity inspection of impellers.

    6.4.5.  Drain bearings and seal hub plugs.

    6.4.6.  Grease and lube as needed.

    6.4.7.  P-4 is for off-loading and discharge transfers.

6.5. *Motor* inspected monthly per manufacturer recommendation.

    6.5.1.  Visual inspection for wear and tear.

    6.5.2.  Clean the motor from debris.

    6.5.3.  Add grease as needed.

6.6. *Blower* inspected monthly per manufacturer recommendation.

    6.6.1.  Visual inspection for wear and tear.

    6.6.2.  Check for oil leaks.

    6.6.3.  Visual integrity inspection of pipes.

    6.6.4.  Change oil every month.

    6.6.5.  Two blowers BL-1 & BL-2.

    6.6.6.  Change air filter.

6.7. *pH probe* inspected and calibrated per manufacturer recommendation.

    6.7.1.  Visual inspection daily.

    6.7.2.  Cleaned daily.

    6.7.3.  Calibrated daily or before start of shift.

    6.7.4.  Calibrated by vendor semi-annually.

6.8. *Ammonia meter* inspected and calibrated per manufacturer recommendation.

    6.8.1.  Visual inspection daily.

    6.8.2.  Cleaned ammonia probe daily.

    6.8.3.  Calibrated daily or before start of shift.

6.9. *Flow meter* inspected and calibrated per manufacturer recommendation.

    6.9.1.  Visual inspection daily.

    6.9.2.  Cleaned flume daily.

    6.9.3.  Calibrate weekly by Onsite Staff.

    6.9.4.  Calibrate by vendor semi-annually.

# Leachate Treatment Process (continued)

7. **Chemicals**
    - 7.1.1.  Caustic (Sodium Hydroxide)
    - 7.1.2.  Sulfuric Acid
    - 7.1.3.  Lime (Calcium Hydroxide)
    - 7.1.4.  SDS's for reagents are available in the Plant Manager's Office.

8. **Personal Protective Equipment**
    - 8.1. Hard Hat
    - 8.2. Safety Glasses always and Face Shield as needed.
    - 8.3. Steel toe boots
    - 8.4. Gloves (nitrile and neoprene gloves are recommended).
    - 8.5. Ear protection when exposed to sounds that are greater than 85 decibels.
    - 8.6. Avoid breathing toxic vapors, fumes, or dust. Inquire about Permissible Exposure Limits (PELs) with the EHS Director.

9. **Solid Waste Management**
    - 9.1. Contact the EHS Director for waste disposal of tank solids from clean-out and any unused reagents.

Case 3:25-cr-00138     Document 19     Filed 08/05/25     Page 117 of 120 PageID #: 158

# Petroleum Contacted Water (PCW) Treatment Process

1. **Waste Stream Approval**
    1.1. Waste Generator submits:
        1.1.1. A completed Profile, New Material Approval (NMA) form, sample, and analytical results.
        1.1.2. The NMA (New Materials Approvals) team reviews all submitted information for approval.
        1.1.3. Only approved waste streams are allowed to be scheduled for acceptance and process into the Nashville facility.
        1.1.4. Profile to be recertified annually or sooner if process and/or chemical constituents change.
    1.2. Scheduling
        1.2.1. Hydrocarbon loads picked up by Onsite are scheduled prior to pick-up.
        1.2.2. Non-Onsite loads are scheduled according to a pre-arranged agreement with the transporter.

2. **Fingerprint Analysis**
    2.1. Visual - Color, odor, layers, solids.
    2.2. Analysis – pH the water content.
    2.3. Record Keeping – Record all information on the Hydrocarbon Receiving Form.
    2.4. Maintain and store sample jars for 15 days.

3. **Receiving**
    3.1. Truck arrives to the Nashville facility.
    3.2. Each load has an Onsite manifest or equivalent.
    3.3. Upon arrival, the lab technician reviews the manifest, inspects the load, and takes a sample.
    3.4. The lab technician conducts a fingerprint analysis for color, odor, layers, solids and records the results on the Hydrocarbon Receiving Form.
    3.5. The lab technician identifies the Plant Manager of any non-conformity resulting from the fingerprint analysis.
    3.6. The Plant Manager may take steps to accept the load, such as, portioning of the load, pretreatment, or offloading to a quarantine tank.
    3.7. If rejected, take a 4 oz. sample, return the load to the generator, and keep the sample for 30 days.
    3.8. If accepted, offload.

4. **Offload**
    4.1. The load is offloaded.
    4.2. The liquid phase of the load is transferred to receiving tank.
    4.3. The liquid phase is allowed to settle.

5. **Batch Process**
    5.1. Create a Hydrocarbon Batch.
    5.2. After the waste stream settles in the receiving tank, the liquid phase is discharged to a screen, then pumped through a decanter.
    5.3. Lime is injected prior to processing.
    5.4. The water discharged is pumped to a treatment tank.
    5.5. Lime and/or polymer is added.

Case 3:25-cr-00138    Document 19    Filed 08/05/25    Page 118 of 120 PageID #: 159

# PCW Treatment Process (continued)

5.6. pH is adjusted with sodium hydroxide or sulfuric acid.

5.7. The treated water is allowed to settle.

5.8. Test the treated water.

5.9. If pH is acceptable, water can be transferred.

5.10. If acceptable, the clear water is transferred to the effluent storage tanks.

5.11. If the water is not acceptable, retreat.

5.12. The solids are solidified for off-site disposal.

5.13. The water is tested, and the results are recorded on the Batch Screening Prior to Discharge form.

5.14. If the Plant Manager does not accept the results, the water is retreated.

5.15. If the Plant Manager approves the results, the water is discharged.

5.16. The oil in the oil tank is processed.

5.17. The oil is transferred to a collection tank for storage.

5.18. The oil is sold as a commodity or properly disposed.

5.19. Complete the Process Form.

5.20. Thoroughly rinse the decanter at the end of the shift to remove debris.

6. **Maintenance**

6.1. Hydrocarbon Receiving Tanks emptied every 30-days.

6.2. *Bottoms, sludges, and debris* will be removed for disposal. If a substantial quantity of materials is present, bottoms/sludge removal will occur every 2 weeks.

6.3. *Pump* inspected monthly per manufacturers recommendation.

6.3.1. Visual inspection of wear and tear of pumps P-1, P-2, P3.

6.3.2. Clean debris from pump

6.3.3. Open belt cover to inspect belts for wear and tear.

6.3.4. Visual inspect integrity of impellers.

6.3.5. Drain bearings and seal hub plugs.

6.3.6. Grease and lube as needed.

6.3.7. P-1 is the receiving pump, P-2 is the decanter pump, P-3 is the lime slurry pump.

6.4. Decanter inspected monthly per manufacturer recommendation.

6.4.1. Visual inspection of wear and tear.

6.4.2. Inspect belts.

6.4.3. Lube bearings.

6.4.4. Look for debris that may cause obstructions.

6.5. Shaker screen inspected monthly.

6.5.1. Visual inspection of wear and tear.

6.5.2. Inspect the mesh screen.

6.5.3. Inspect the springs.

6.5.4. Inspect the bolt tension rings.

6.6. Motor inspected monthly per manufacturer recommendation.

6.6.1. Visual inspect for wear and tear.

6.6.2. Clean the motor from debris.

6.6.3. Add grease as needed.

6.7. *pH probe* inspected and calibrated per manufacturer recommendation.

6.7.1. Visual inspection daily.

6.7.2. Cleaned daily.

6.7.3. Calibrated daily or before start of shift.

6.7.4. Calibrated by vendor semi-annually.

Case 3:25-cr-00138    Document 19    Filed 08/05/25    Page 119 of 120 PageID #: 160

# PCW Treatment Process (continued)

6.8. *Flow meter* inspected and calibrated per manufacturer recommendation.
  - 6.8.1. Visual inspection daily.
  - 6.8.2. Clean flume daily.
  - 6.8.3. Calibrate weekly by Onsite staff.
  - 6.8.4. Calibrate by vendor semi-annually.

7. **Chemicals**
  - 7.1.1. Caustic (Sodium Hydroxide)
  - 7.1.2. Sulfuric Acid
  - 7.1.3. Lime (Calcium Hydroxide)
  - 7.1.4. Cationic Polymer
  - 7.1.5. Anionic Polymer
  - 7.1.6. SDS's for reagents are available in the Plant Manager's Office.

8. **Personal Protective Equipment**
  - 8.1.1. Hard Hat
  - 8.1.2. Safety Glasses always and Face Shield as needed.
  - 8.1.3. Steel toe boots
  - 8.1.4. Gloves (nitrile and neoprene gloves are recommended).
  - 8.1.5. Ear protection when exposed to sounds that are greater than 85 decibels.
  - 8.1.6. Avoid breathing toxic vapors, fumes, or dust. Inquire about Permissible Exposure Limits (PELs) with the EHS Director.

9. **Solid Waste Management**
  - 9.1. Contact the EHS Director for waste disposal of tank solids from clean-out and any unused reagents.

Case 3:25-cr-00138    Document 19    Filed 08/05/25    Page 120 of 120 PageID #: 161